Virgil THURSTON and Bonnie
Thurston, Appellants,

v.

J.W. BALLINGER and Bank of Cairo
and Moberly, Respondents.

No. WD 48069.

Missouri Court of Appeals,
Western District.

July 12, 1994.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Aug. 30, 1994.

Application to Transfer Denied
Oct. 25, 1994.

Charles W. Armbruster, III, Edwardsville, IL, for appellants.

Gregory J. Bien, Topeka, KS, for respondent Ballinger.

John H. Marshall, Clayton, for respondents Bank of Cairo and Moberly.

Before BERREY, P.J., and KENNEDY and ELLIS, JJ.

KENNEDY, Judge.

Virgil and Bonnie Thurston appeal from summary judgments and dismissals suffered in a damage suit they filed against J.W. Ballinger, III and the Bank of Cairo and Moberly. The Thurstons claimed in their amended petition that Ballinger had slandered Virgil Thurston in a statement given by Ballinger to an FBI agent in the course of a criminal investigation, as a result of which the Thurstons were damaged. Bonnie joins Virgil as a plaintiff because she was a co-owner with Virgil of a restaurant business, whose profits are alleged to have suffered as a result of Ballinger's slander.

The amended petition was in 11 counts. Ten of the counts were against Ballinger and against the Bank as Ballinger's principal. They sounded in tort, each of them alleging Ballinger's slander as its basis. An eleventh count was against the Bank only, and sought damages for breach of commitment to lend the Thurstons $600,000.

■ In a summary judgment appeal, we determine whether there was any genuine issue of material fact left unresolved by the record before the trial court, and if the party to whom judgment was granted was entitled to judgment as a matter of law. Rule 74.-04(c). *Cooper v. Missouri Bd. of Probation and Parole,* 866 S.W.2d 135, 137 (Mo. banc 1993). In this case, the trial court had before it only the pleadings in the case, and the deposition of Virgil Thurston. No affidavits were filed by either party, except by the Bank in connection with Thurston's breach of contract count (Count 11). See Rule 74.-04(e). For purposes of review, we take as true the evidence favorable to the party against whom summary judgment was granted. We do not consider whether any fact is true or not, but only whether there is an issue as to a fact which is material. *Id.*

The background facts are as follows:

Ballinger was president and chief executive officer of the Bank of Cairo and Moberly. Thurston, who was in the restaurant business, was a director of the Bank. The Bank had committed to lend Thurston $600,-000 to be used in the construction of a new restaurant. This sum, when added to an existing indebtedness of $60,000–65,000, exceeded the Bank's lending limit to Thurston by approximately $250,000. The First National Bank of St. Joseph agreed to participate in the loan with the Bank of Cairo and Moberly to the extent of $250,000. When construction of the restaurant was in its final stages, Ballinger on one Saturday told Thurston that the St. Joseph bank had reneged on $75,000 of its agreed participation. Thurston

was therefore $75,000 short of urgently needed cash with which to complete construction.

Ballinger asked Thurston if he had a friend who could lend him the needed funds. Thurston replied he would not ask a friend for a loan of this kind. Ballinger asked Thurston if there was anybody to whom the Bank would be willing to lend the money. Thurston mentioned his daughter, who was 20 or 21 years old, but added: "J.W., you know and I know she does not have the collateral to borrow that kind of money." Ballinger agreed.

Thurston then mentioned his half-brother, whose name was Carl Campbell. Thurston explained in his deposition that he normally referred to Campbell as his brother, but, in explanation of his different last name, he told Ballinger Campbell was his half-brother. Ballinger asked what type of collateral Campbell had. Thurston said Campbell had a farm.

Ballinger seems tentatively to have approved the loan to Campbell, for Thurston contacted Campbell and asked him and his wife, Kathryn, who lived near Columbia, to come talk with him. Campbell and his wife agreed to borrow $80,000 and lend it to Thurston. On Sunday afternoon, the Campbells and Thurston and his wife met Ballinger at the Bank. Ballinger prepared all the loan papers representing an $80,000 loan from the Bank to the Campbells. It was a demand note, and was not secured by a deed of trust on the farm. Ballinger also prepared a promissory note from the Thurstons to the Campbells in the same amount.

The proceeds of the Bank's loan to Campbell were mailed to Campbell in the form of a check. Campbell endorsed the check and returned it to the bank. It was deposited to Thurston's credit.

In the course of a later bank examination by regulatory authorities, the examiners came upon the foregoing transaction. Thinking it had the characteristics of an illegal "nominee loan," they turned it over to the FBI for investigation. In the course of that investigation, Ballinger made the statements to FBI Special Agent Clapp which Thurston alleges were defamatory. Those statements were the following, as set forth in Thurston's petition:

A. "Thurston was not seeking a loan from [the Bank of Cairo and Moberly] as he knew what the legal lending limit of the bank was and he knew he could not borrow any additional money as he had reached that legal lending limit;"

B. "[O]n February 13, 1984, Virgil Thurston . . . asked Ballinger to consider giving an $80,000.00 loan to Campbell . . . [and] that Thurston did not tell [me] nor did [I] know that Campbell was related to Thurston . . . and [I] knew nothing about [Campbell];"

C. "Thurston . . . told [me] that the money was needed for Campbell's farming operation . . . [and] the loan had . . . been recommended by Thurston;"

D. "Thurston told [me] about September 1984, . . . that the loan would be his responsibility . . . as Campbell had loaned him the $80,000. . . ."

The true facts, according to Thurston's deposition testimony, were as stated above, i.e., that Thurston had told Ballinger that Carl Campbell was his half-brother; that he had not represented to Ballinger that the proceeds of the loan to Campbell were needed for Campbell's farming operations, but that Ballinger knew that the proceeds were to be immediately re-lent by the Campbells to Thurston; and that Thurston had not recommended to Ballinger that he make the Campbell loan.

The nominee loan device to evade the loan ceiling was in violation of banking laws and regulations. On February 1, 1989, Ballinger and Thurston were jointly indicted in a four-count indictment in Federal Court.

After Thurston was indicted, Thurston learned for the first time of Ballinger's statements to the FBI, which are now claimed to have been false and defamatory. The fact of the indictment was publicized in and around Moberly, and Thurston says his restaurant business, which had theretofore been increasing or staying the same, began to fall off markedly. Thurston attributes the loss of business to Ballinger's defamation. He claims people of Moberly, in their selection of

a place to dine, are influenced by the good or bad reputation of the proprietor, and are inclined not to patronize a person of bad reputation. He claims also to have suffered emotional distress as a result of the defamation.

Thurston later pleaded guilty to a misdemeanor and the felony charges were dropped. Ballinger was tried and convicted on three felony counts.

The eleven counts of plaintiffs' amended petition charged Ballinger and the Bank, as Ballinger's principal, with: slander per se, slander per quod, tortious interference with contractual relations, outrageous conduct, fraud, and abuse of process. The trial court dismissed or granted summary judgment against plaintiffs in favor of defendants on all counts.

An additional count of the petition (Count 11) charged the Bank with breach of contract, in failing to honor its commitment to make a $600,000 loan to Thurston. The trial court granted summary judgment on this claim, also.

Plaintiffs have appealed from the summary judgment or judgment of dismissal as to all counts except Count 9, denominated "Fraud."

Ballinger and the Bank put forward the following five points, each of which, they say, is fatal to Thurston's case:

1. That the Thurston claim is barred by the two-year statute of limitations, section 516.140, RSMo 1986.

2. That Ballinger's statements, if not true in all particulars, were substantially true.

3. That Ballinger's statements, because they did not impute criminal conduct to Thurston, were not slanderous per se;

4. That Thurston's petition does not charge slander per quod because it does not sufficiently allege special damages;

5. That Ballinger's statements to the FBI agent were qualifiedly privileged, and were therefore not actionable unless made with malice.

Ballinger goes ahead to say that his false statements were made without malice.

### COUNTS 1–4. SLANDER PER SE vs. SLANDER PER QUOD

At the threshold, we take up the question whether to apply to this case the slander per se/slander per quod analysis invited by numbers 3 and 4 above.

■ The distinctions between slander per se and slander per quod have been abolished by *Nazeri v. Missouri Valley College,* 860 S.W.2d 303, 313 (Mo. banc 1993). *Nazeri* was handed down after the summary judgment in this case, and while the appeal was pending here. Ballinger argues that *Nazeri* should not be given retrospective application, but that we should apply the former slander per se and slander pro quod distinctions and rules in our decision in the present case.

*Sumners v. Sumners,* 701 S.W.2d 720 (Mo. banc 1985), gives the test by which to determine whether an overruling decision is to have retrospective effect. At the threshold, however, before the retrospective application of the decision becomes an issue, it must be determined that it "establish[es] a new principle of law ... by overruling clear past precedent." *Id.* at 724, quoting *Chevron Oil Co. v. Huson,* 404 U.S. 97, 106, 92 S.Ct. 349, 355, 30 L.Ed.2d 296 (1971). *Nazeri* was not a bolt from the blue; MAI 23.10(1) and MAI 23.10(2) (accompanied by the 1980 withdrawal of the slander per se and slander per quod instructions) had already effectively done away with the archaic slander per se and per quod distinctions. *Nazeri* did no more than re-confirm what had already been done by court rule. That being the case, the *Nazeri* decision is applicable retrospectively. We do not then consider the other two prongs of the test, *i.e.,* whether the purpose and effect of the newly announced rule will be enhanced or retarded by retrospective operation, and whether equity would, upon balance, be served or disserved by retrospective application of the new rule. *Sumners,* 701 S.W.2d at 724.

On the basis of *Nazeri,* we do not apply the per se/per quod analysis. *Nazeri* says:

"We hold that in defamation cases the old rules of *per se* and *per quod* do not apply and plaintiff need only to plead and prove the unified defamation elements set out in MAI 23.[10(1)] and 23.[10(2)]. In short, plaintiffs need not concern themselves with whether the defamation was *per se* or *per quod*, nor with whether special damages exist, but must prove actual damages in all cases."

*Nazeri*, 860 S.W.2d at 313.

## COUNTS 1–4. STATUTE OF LIMITATIONS

■ We take up first the question whether the statute of limitations bars this suit for slander. The statute of limitations period applicable to causes of action alleging slander is two years. Section 516.140, RSMo 1986. The question in this case is when the statute begins to run. Ballinger claims the statute begins to run when the defamatory statement is made, which was, in this case, February 24, 1987. If that were so, the two-year statute would have expired February 24, 1989. Thurston's original petition, filed March 14, 1990, and his amended petition, filed October 1, 1990, would have come too late.

■ The statute of limitations began to run, however, not when the defamatory statement was made, but when damages were ascertained. Section 516.100, RSMo 1986. *Barnard v. Boulware*, 5 Mo. 454 (1838), cited by Ballinger, was decided before section 516.100 was enacted. Damages are ascertained when the fact of damage appears, not when the extent or the amount of the damage is determined. *Newton v. B.P.S. Guard Servs., Inc.*, 833 S.W.2d 14, 16 (Mo. App.1992); *Title Ins. Co. of Minnesota v. Construction Escrow Serv., Inc.*, 675 S.W.2d 881 (Mo.App.1984). Thurston said in his deposition—which was the only sworn testimony before us—that he did not know the content of Ballinger's statement until after he was indicted. His defense lawyer then secured a copy of the statement and Thurston for the first time knew Ballinger had made false statements about him. Soon after the indictment, Thurston's restaurant business, which had been increasing or staying the same up to that time, began to fall off markedly. Thurston claims the loss of business is attributable to Ballinger's defamation. He says people of Moberly, in their selection of a place to dine, are influenced by the good or bad reputation of the proprietor, and are inclined not to patronize a person of bad reputation.

■ We hold therefore that the statute of limitations began to run after Thurston's indictment, when his business began to decline. Only then, after he had learned of Ballinger's false statements and had begun to suffer the loss of business, did the fact of damage from the false statements appear. The statute of limitations began to run at that time, and Thurston's slander suit against Ballinger was filed within the statutory time limit. Sections 516.100, 516.140, RSMo 1986.

## COUNTS 1–4. SUBSTANTIAL TRUTH AS DEFENSE

■ Ballinger, for his second line of defense, says his statements about Thurston and his role in the nominee loan artifice were substantially true. A person is not bound to exact accuracy in his statements about another, if the statements are essentially true. Ballinger cites *Turnbull v. Herald Co.*, 459 S.W.2d 516, 518 (Mo.App.1970), where a newspaper had reported that plaintiff had been arrested as a burglary suspect, after the police had found "thousands of dollars in jewelry" in a raid on the plaintiff's house. Plaintiff in his libel suit proved that the "thousands of dollars in jewelry" was actually $500 worth. *Id.* at 519. Said the court, in holding the statement was substantially true and therefore not actionable: "As a matter of fact, in an arrest for burglary it would make no great difference what value the items bore. The sting of the article is the arrest of plaintiff suspected of burglary." *Id.* The court went ahead to say, in referring to an analogous case: "The appeals court found this account of the larger amount was an inaccuracy which did not alter the complexion of the essential facts. It would have no different effect on the reader's mind than that produced by the literal truth." *Id.*, citing *McCracken v. Evening News Ass'n*, 3 Mich.App. 32, 141 N.W.2d 694 (1966).

We are unable to say, however, that the statements of which Thurston complains were inconsequential or slight inaccuracies. They alter the complexion of the true facts, as Thurston testifies what the true facts were. It is one thing for Thurston to have followed the suggestion of the professional banker Ballinger and to have produced a nominal borrower, not knowing that his doing so was malum prohibitum; and quite another thing to have induced an innocent Ballinger to make the Campbell loan by his malum in se fraudulent misrepresentations. Thurston maintains the former scenario represented the true facts, and that the latter scenario was painted by Ballinger's false statement to the FBI agent.

Thurston argues, perhaps correctly, that his indictment, with its aftershocks, would have been less likely if Ballinger had not made the false statements to the investigator. One count of the indictment charged Thurston with the false statement, appearing on the Carl Campbell loan application, that the loan was for "agricultural purposes," in violation of Title 18, United States Code, sections 2 and 1014. Ballinger's statement supported this charge, but Thurston denies it is true. By Thurston's account, the facts would not have supported the charge. See *U.S. v. Kramer*, 500 F.2d 1185, 1187 (10th Cir.1974).

### COUNTS 1–4.   QUALIFIED PRIVILEGE

■ Ballinger says, finally, his statement to the FBI agent was qualifiedly privileged. (He does not claim absolute privilege.) That his statement is protected by qualified privilege is true, *Rucker v. K–Mart Corp.*, 734 S.W.2d 533, 535 (Mo.App.1987), but that means only that plaintiff must prove that the false statements were made with malice. *Id.* Plaintiff has the burden to prove the statements were made "with knowledge that [they were] false, or with reckless disregard for whether [they were] true or false at a time when defendant has serious doubt as to whether [they were] true." MAI 23.10(2). If Ballinger's statements about Thurston were false, there is clearly a genuine issue of fact whether they were made with malice.

### COUNTS 5–8, 10.   OTHER COUNTS IN TORT

Appellant Thurston further claims that the trial court erred in granting summary judgment or in dismissing those counts of Thurston's petition against Ballinger and the Bank which asserted, or attempted to assert, claims of: intentional interference with contract or business relationship; outrageous conduct; and abuse of process. All the counts are based upon the same factual matrix as the slander case, to which the parties' briefs are mainly directed.

Since we reverse the summary judgment for defendants and against plaintiff on the slander count, and remand it for further proceedings, we reverse and remand also upon the other counts against Ballinger and the Bank as Ballinger's principal (except Count 9, denominated "Fraud," from which no appeal was taken). While we might in some summary judgment cases reverse as to one or more counts, and affirm as to others, to do so is often an invitation to piecemeal appeals. The various counts proceed from the same factual scenario and the same damage, and assert entitlement to relief upon different theories. We therefore reverse the summary judgment upon all counts from which plaintiffs have appealed.

### COUNT 11.   BREACH OF CONTRACT

■ Count 11 of the petition is of a different character, and calls for appellate review. It is a breach of contract claim against the Bank. This claim is that the Bank contracted to furnish $600,000 to the Thurstons, but failed to do so. The Bank's failure to perform its commitment necessitated Thurston's arrangement to borrow $80,000 from the Campbells, which led to the unfortunate loan transaction which has been described earlier.

The Bank, in support of its motion for summary judgment, filed an affidavit which stated that ultimately the Thurstons owed the Bank more than the $600,000. That however does not meet the allegation of breach of contract asserted in the petition.

The summary judgment on Count 11 of the petition (breach of contract against Bank) is reversed.

Summary judgment as to all counts of the amended petition is reversed, and the cause is remanded to the trial court for further proceedings in accordance with the foregoing opinion.

All concur.