# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 11-1789

———————

BP Group, Inc.,

        Appellee,

v.

David N. Kloeber, Jr.,

        Appellant.

\* \* \* \* \* \* \* \* \* \* \*

Appeal from the United States
District Court for the
District of Minnesota.

———————

Submitted: October 18, 2011
Filed: January 10, 2012

———————

Before RILEY, Chief Judge, LOKEN and BENTON, Circuit Judges.

———————

RILEY, Chief Judge.

David N. Kloeber, Jr. guaranteed Capital Wings Airlines, Inc.'s (CWA) obligations under an Aircraft Management Agreement (AMA) between CWA and BP Group, Inc. (BP Group). BP Group sued CWA and Kloeber for breach of contract. The district court denied Kloeber's motion for summary judgment and granted summary judgment to BP Group on its claims Kloeber was liable under the guaranty for CWA's breach of the AMA. Kloeber appeals, arguing the district court erred in (1) finding the AMA was valid and enforceable, (2) imputing the cost of refurbishing the aircraft to Kloeber, and (3) calculating and awarding damages. We affirm in part, reverse in part, and remand for further proceedings.

## I.    BACKGROUND

BP Group, a Florida corporation, leased a Gulfstream G200 jet aircraft (aircraft) from Wachovia National Bank (Wachovia) pursuant to a July 31, 2000 equipment lease (headlease).[1]  CWA, a Texas corporation, was a wholly owned subsidiary of Corsair Aviation, LLC (Corsair).[2]  Corsair also owned JetChoice I, LLC (JetChoice), a now-bankrupt Minnesota charter company.  JetChoice and CWA were "on demand air carriers" licensed by the Federal Aviation Administration (FAA) to conduct operations under Part 135 of the Federal Aviation Regulations.  Kloeber and Gerald Trooien, both Minnesota residents, co-owned Corsair.  Kloeber was the majority owner, and Trooien held the minority position.

On August 20, 2008, BP Group and CWA executed the AMA, under which CWA acquired the right to use the aircraft in its commercial charter operations. Kloeber, who served as the Chief Manager and sole Governor of Corsair, signed the AMA for CWA.  Kloeber and Trooien each personally guaranteed CWA's performance of the AMA and "the full and prompt payment of all sums and charges due and payable by CWA, its successors and assigns."

Although BP Group retained the right under the headlease to sublease the aircraft to an entity under BP Group's direct control, the headlease prohibited BP Group from assigning, subleasing, or otherwise transferring its rights and obligations in the aircraft absent Wachovia's consent.  The parties originally negotiated the AMA as an Aircraft Dry Sublease and Management Agreement (sublease), but Wachovia refused to consent to the agreement because CWA intended to use the aircraft in commercial charter operations.  BP Group's Chief Executive Officer, Ben Price, notified Trooien and a JetChoice executive, Brian Overvig, of Wachovia's refusal, and

---

[1]Wachovia, later acquired by Wells Fargo Equipment Company, was the successor-in-interest to First Union Commercial Corporation.

[2]CWA ceased operations and liquidated its assets in July 2009.

asked if anyone at JetChoice had any contacts at Wachovia. Marvin Murray, counsel for JetChoice and CWA, contacted Wachovia to try to persuade Wachovia to consent to the sublease, but failed.

On July 9, 2008, Trooien suggested restructuring the transaction as an aircraft management agreement rather than a sublease. Overvig and Murray objected to Trooien's suggestion, noting the FAA would still consider the agreement a lease and Wachovia would not consent. BP Group's aviation counsel, Kevin Johnson, agreed with Trooien that the deal could be restructured as a management agreement. In an August 5, 2008 e-mail circulating the initial draft of the AMA, which was modified from the sublease, Johnson stated, "Ben [Price] is prohibited from subleasing this aircraft to CWA by the terms of his Wachovia lease, but there is no reason why we cannot do this deal pursuant to a management agreement under the FAA's Operational Control Specifications."

BP Group and CWA executed the AMA on August 20, 2008. At that time, Kloeber, CWA, and BP Group believed the AMA would comply with FAA requirements and would not violate the headlease. Claiming he and CWA were not represented by counsel when he executed the AMA, Kloeber asserts Johnson's assurances "mollified any trepidation CWA and Kloeber had about the AMA transaction."

BP Group never asked for Wachovia's consent to enter the AMA. Relying on its experience in three prior Wachovia aircraft management agreements with on-demand carriers, BP Group maintains the headlease does not require Wachovia's consent to enter into a management agreement. During discovery, Wachovia expressed its view that the headlease prohibited the AMA, and indicated Wachovia would not have consented to the transfer.

The AMA required BP Group "to provide the aircraft to CWA 'on a non-exclusive, non-continuous basis and appoint[] CWA as the sole and exclusive charter operator of the Aircraft' for a term of approximately four years." In exchange, CWA agreed to pay BP Group for each hour of use, with a minimum payment of $80,000 per month. The AMA restricted assignment by either party, but CWA could "assign its rights and obligations under [the AMA] to another Part 135 on-demand carrier having common ownership with CWA." After executing the AMA, Kloeber and Overvig discussed whether CWA or JetChoice should operate the aircraft. BP Group contends CWA assigned the aircraft to JetChoice, but admits there is no formal assignment in the record.

The AMA also permitted CWA to paint and refurbish the aircraft at CWA's expense. During such service, BP Group would not receive minimum monthly payments. On September 17, 2008, BP Group's pilot flew the aircraft to West Star Aviation (West Star) in Grand Junction, Colorado, for refurbishing and painting. West Star was instructed to make the aircraft look identical to JetChoice's two other aircraft. West Star completed its work in December 2008 at a cost of $647,887.03. Following refurbishment, the aircraft was ready for FAA inspection, but West Star would not release the aircraft until it received full payment.

The parties dispute who is responsible for paying West Star. BP Group contends JetChoice's Director of Maintenance instructed West Star to paint the aircraft to match the JetChoice scheme, which was consistent with CWA's plans to assign the AMA to JetChoice and operate the aircraft under JetChoice's certificate. BP Group also emphasizes a dispute between Trooien and Kloeber about which of the two of them was responsible for the West Star bill. Neither contends BP Group was responsible.

Kloeber denies CWA ever entered into any oral or written contract with West Star. Kloeber argues correspondence between West Star and other parties indicates

-4-

Dennis Blackburn, a broker who had represented BP Group in the past, authorized the work.

On May 1, 2009, after West Star had held the aircraft for more than six months, BP Group paid West Star and retrieved the aircraft. On June 14, 2009, BP Group entered into an aircraft management agreement with Priester Aviation, LLC (Priester agreement) under which Priester acquired rights to use the aircraft in its charter operations.

On August 4, 2009, BP Group sued CWA, Kloeber and Trooien for breach of contract, alleging CWA breached the AMA, and Kloeber and Trooien each breached their respective guaranties. On October 22, 2009, BP Group obtained a default judgment against CWA. On January 7, 2010, BP Group dismissed without prejudice its claims against Trooien, who later filed for bankruptcy.

BP Group and Kloeber filed cross motions for summary judgment, arguing over the enforceability of the AMA. The district court granted BP Group's motion and denied Kloeber's. The district court entered judgment in favor of BP Group in the amount of $1,518,221.67, which included (1) BP Group's payment to West Star, (2) "monthly payments due under the [AMA], less charter revenue earned from alternate sources and BP Group's use of the [a]ircraft," and (3) "the cost[] of returning the aircraft to Florida." Kloeber appeals, arguing the district court erred in (1) concluding the AMA was valid and enforceable, (2) finding Kloeber liable for the refurbishment, and (3) calculating damages under Florida law.

## II.  DISCUSSION

### A.  Standard of Review

We review the district court's resolution of cross motions for "summary judgment de novo, viewing the record in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor." Chambers v.

-5-

<u>Pennycook</u>, 641 F.3d 898, 904 (8th Cir. 2011). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[3] Fed. R. Civ. P. 56(a).

### B.    Mutual Mistake

Kloeber contends the district court erred in failing to find the parties' mistaken belief that BP Group could transfer operational control of the aircraft to CWA justified rescinding the AMA. Under Florida law, "[w]here a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party." <u>Leo v. MacLeod</u>, 752 So.2d 627, 629-30 (Fla. Dist. Ct. App. 1999) (quoting <u>Restatement (Second) of Contracts</u> (<u>Restatement</u>) § 152 at 385 (1981) (internal quotation marks omitted)).

> To obtain such relief, a plaintiff must not only prove mutual mistake regarding a basic assumption underlying the contract, but must also establish "that the contract did not put the risk of mistake on the party seeking rescission." 27 Richard A. Lord, <u>Williston on Contracts</u>, § 70:69, at 415 (2003). <u>Accord</u> 13 <u>Am. Jur. 2d Cancellation of Instruments</u> §§ 27, 29 (2006).

<u>Rawson v. UMLIC VP, L.L.C.</u>, 933 So.2d 1206, 1210 (Fla. Dist. Ct. App. 2006). "A party bears the risk of a mistake when . . . he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient." <u>Id.</u> (quoting <u>Restatement</u> § 154).

---

[3]The parties agree the district court was correct to apply Florida law to this diversity action based on a choice-of-law provision in the AMA.

Treating "limited knowledge as sufficient" is sometimes described not as a mistake, but as "conscious ignorance." Harbor Ins. Co. v. Stokes, 45 F.3d 499, 502 (D.C. Cir. 1995) (quoting Restatement § 154, cmt. c). A party who is aware of a problem or uncertainty, yet elects to "'take a chance' and close," waives its right to rescind. Rosique v. Windley Cove, Ltd., 542 So.2d 1014, 1016 (Fla. Dist. Ct. App. 1989) (per curiam).

Kloeber correctly points out the parties believed, in part based upon the advice of BP Group's outside counsel, that the AMA transferred control of the aircraft to CWA without violating the headlease. But even if we assume the parties' belief constitutes a mistake under Florida law, it does not necessarily follow that CWA had a right to rescind the AMA as Kloeber contends. The undisputed facts in the record establish CWA and Kloeber consciously accepted the risk of any mistake.

Long before Kloeber executed the AMA, CWA reviewed the headlease and understood the implications of the transfer restrictions. CWA was also aware Wachovia refused to consent to the sublease because of CWA's proposed use. After Wachovia's denial, the parties redrafted the sublease as a management agreement, as Trooien suggested, despite Overvig's and Murray's concerns that the FAA would still consider the agreement a lease and Wachovia would not consent to the transfer.

Although Kloeber acknowledges those doubts about the efficacy of the AMA, Kloeber asserts "BP Group offered no evidence that anyone associated with CWA or Kloeber had reservations about the legality of the transaction following attorney Johnson's email of August 5, 2008." But the timing of the warnings CWA received is not dispositive, and Kloeber's contention "any doubts with respect to the legality of the AMA were put to bed by [Johnson's] representations that a 'management agreement' would pass FAA muster" is unavailing.

As the district court observed, "CWA and [Kloeber] were fully aware that Wachovia may not approve the [AMA], but nonetheless agreed to sign it." CWA could have required Wachovia's consent, but did not. "The mistake of risk can be placed foursquare on the shoulders of a party who has had the opportunity to conduct the necessary due diligence, but has failed to do so." Rawson, 933 So.2d at 1210 (quoting Williston on Contracts, § 70:79, at 457 (internal quotation marks omitted)).

CWA's alleged reliance on an unsupported opinion by opposing counsel was not due diligence under the circumstances. Kloeber is a sophisticated businessman familiar with aviation transactions. Due diligence would require CWA to check with Murray, its own counsel, to see if the AMA resolved Murray's and Overvig's ongoing concerns. Despite doubts about the efficacy of the AMA absent Wachovia's consent, CWA treated its limited knowledge as sufficient and executed the AMA. The district court did not err in concluding CWA waived any conceivable right to rescind it might have had.

### C.     Lack of Consideration

Kloeber asserts the transfer restrictions in the headlease render the AMA null and void under applicable law, making BP Group's assignment unenforceable and depriving CWA of any benefit from the AMA. According to Kloeber, "[b]ecause BP Group had nothing to assign to CWA, the AMA lacked the requisite consideration and cannot stand." We disagree.

"Mutual promises and obligations are sufficient consideration to support a contract." Santos v. Gen. Dynamics Aviation Servs. Corp., 984 So.2d 658, 661 (Fla. Dist. Ct. App. 2008) (quoting Caley v. Gulfstream Aerospace Corp., 428 F.3d 1359, 1376 (11th Cir. 2005) (internal marks omitted)). BP Group's promise to make the aircraft available to CWA under the terms of the AMA is adequate consideration to support the AMA. See Amquip Crane Rental, LLC v. Vercon Const. Mgmt., Inc., 60

-8-

So.3d 536, 540 (Fla. Dist. Ct. App. 2011) (finding "no issue of mutuality of contract which would make the contract unenforceable" because the lessor "promised to lease equipment to [the lessee], and [the lessee] promised to pay rent for the equipment").

Kloeber's allegations all address whether BP Group breached the AMA, not whether "[t]he AMA [was] void for lack of consideration." The AMA might have been null and void as to Wachovia, but that would not excuse any failure by BP Group to perform its obligations under the AMA. As required by the AMA, BP Group made the aircraft available for paint and refurbishment without rent. BP Group's consideration for the AMA was sufficient.

## D.    Conditions Precedent

We also reject Kloeber's contentions that (1) "CWA's performance is . . . excused by BP Group's failure to transfer operational control to CWA, a condition precedent to the AMA"; and (2) "the AMA, by requiring both parties to provide all instruments or documents as may be required or requested to carry out the intent and purpose of the AMA, required [BP Group], before it tendered the Aircraft to CWA, to obtain written consent from Wachovia allowing [transfer]."

Under Florida law, a condition precedent is "one which calls for the performance of some act, or the happening of some event after a contract is entered into, upon the performance or happening of which its obligation to perform is made to depend." Alvarez v. Rendon, 953 So.2d 702, 708 (Fla. Dist. Ct. App. 2007). "As a general rule, conditions precedent are not favored, and courts will not construe provisions to be such, unless required to do so by plain, unambiguous language or by necessary implication." Covelli Family, L.P. v. ABG5, L.L.C., 977 So.2d 749, 752-53 (Fla. Dist. Ct. App. 2008) (quoting In re Estate of Boyar, 592 So.2d 341, 343 (Fla. Dist. Ct. App. 1992) (per curiam) (internal quotation marks omitted)). A "covenant in a contract will not be construed as a condition precedent, particularly where a forfeiture would result and where it appears a condition precedent, if desired, could

-9-

have been provided for by express agreement." Id. at 753 (quoting Boyar, 592 So.2d at 344).

Nothing in the plain language of the AMA remotely indicates the transfer of operational control was a condition precedent to the AMA's validity rather than a covenant. Nor is there any evidence the parties intended to require BP Group to obtain Wachovia's consent to the AMA for it to be effective. To the contrary, the parties specifically redrafted the AMA in an attempt to avoid the need to ask for Wachovia's consent. Kloeber's attempt to construct a condition precedent from the parties' mutual covenant of further assurances is unpersuasive.

Kloeber's contention that BP Group's "failure to provide CWA with [an aircraft over which CWA could have operational control] constituted a material, substantial and total breach of the contract" also falls short on the undisputed facts in the record. Because of the unpaid West Star bill, neither CWA nor JetChoice ever sought actual possession of the aircraft or arranged for an FAA inspection, both of which were prerequisites to operating the aircraft. By making the aircraft available for refurbishment, BP Group performed its primary obligation under the AMA to that point. CWA never demanded BP Group perform its obligation to make the aircraft available to CWA with full operational control, and thus fails to show BP Group breached its obligation to provide the aircraft as required by the AMA. CWA's performance was not excused.

### E. Costs of Painting and Refurbishing the Aircraft

Kloeber argues he is not liable for refurbishment costs under his guaranty because "there was no agreement, oral or otherwise, between CWA and West Star Aviation with respect to refurbishment costs." According to Kloeber, "West Star Aviation did refurbishment work at the request of Dennis Blackburn, a plane broker who had represented Price in the past."

We agree with the district court's conclusion that Kloeber fails to raise a genuine dispute of material fact as to Kloeber's liability, as a guarantor, for the costs of painting and refurbishing the aircraft. Under Exhibit A to the AMA, CWA, and its successors and assigns, obtained the right to refurbish the aircraft without rent accruing and accepted liability for all costs and expenses related to that work. Kloeber and Trooien each guaranteed to BP Group "the full and prompt payment of all sums and charges due and payable by CWA, its successors and assigns, under the [AMA]."

On January 4, 2009, Trooien sent Kloeber an e-mail stating the West Star bill was "one of the issues which you need to address and provide answers for. Ben [Price] has a legally binding contract that right now he can jam down our throat including damages." Kloeber concedes BP Group is entitled to be reimbursed for the West Star bill, but maintains Trooien should pay. When asked in his deposition if he believed the AMA was not enforceable, Kloeber responded, "No. I expected [Trooien] to pay for [the] refurbishment." In Kloeber's view, Trooien was responsible for the West Star bill and should reimburse BP Group because the AMA was "[Trooien's] agreement—that was his deal."

But the terms of Kloeber's unconditional guaranty do not allow him to avoid his responsibility to reimburse BP Group based on a dispute with his partner. Neither Kloeber nor Trooien has ever asserted BP Group was responsible for the costs of refurbishment under the AMA. And Kloeber's attempt to lay responsibility for the bill on Blackburn is not supported by the record. The district court did not err in holding Kloeber liable for the paint and refurbishment costs.

## F.    Damages

Finally, Kloeber contends the district court erroneously awarded BP Group $860,632.01 in damages for "monthly payments due under the [AMA] less charter revenue earned from alternate sources and BP Group's use of the [a]ircraft." The

-11-

award was based upon the district court's conclusion that the Priester agreement was "substantially similar" to the AMA, as required to award damages under Fla. Stat. § 680.527, allowing BP Group a greater recovery.[4]

---

[4]Under Fla. Stat. § 680.527(1), if a lessee defaults on a lease, the lessor may dispose of the goods "by lease, sale, or otherwise." Sections 680.527(2) and (3) provide

> (2) Except as otherwise provided . . . , if the disposition is by lease agreement substantially similar to the original lease agreement and the new lease agreement is made in good faith and in a commercially reasonable manner, the lessor may recover from the lessee as damages:
>
> (a) Accrued and unpaid rent as of the date of the commencement of the term of the new lease agreement; [and]
>
> (b) The present value, as of the same date, of the commencement of the term of the new lease agreement of the total rent for the then remaining lease term of the original lease agreement minus the present value, as of the same date, of the rent under the new lease agreement applicable to that period of the new lease term which is comparable to the then remaining term of the original lease agreement[.]
>
> . . . .
>
> (3) If the lessor's disposition is by lease agreement that qualifies for treatment under subsection (2), the lessor may elect to proceed under subsection (2) or s. 680.528. If the lessor's disposition is by lease contract that for any reason does not qualify for treatment under subsection (2), or is by sale or otherwise, the lessor may recover from the lessee under s. 680.528 as if the lessor had elected not to dispose of the goods.

Section 680.528(1), which Kloeber contends applies, allows the aggrieved lessor to recover

Kloeber contends the district court erred in finding the Priester agreement and the AMA were substantially similar because the AMA "obligated CWA to pay at least $80,000 per month," minus the hours BP Group operated the aircraft, whereas the Priester agreement "did not impose *any* minimum monthly payment on Priester," resulting in much lower rental payments. Kloeber further contends "[e]ven if the terms of the AMA and the [Priester agreement] were substantially similar, the district court should have, at a minimum, adjusted the difference in rent between the two leases to take account of the differences or otherwise concluded that issues of fact remained for trial." See Fla. Stat. § 680.527; Uniform Commercial Code (UCC) § 2A-527 cmt. 5.[5] In his reply, Kloeber asserts for the first time that the district court's damage calculations were incorrect because BP Group failed to submit competent evidence of present value as required under both Fla. Stat. §§ 680.527 and 680.528.

In support of the district court's damages award, BP Group states "it worked diligently to mitigate its damages" after retrieving the aircraft and, through the Priester agreement, "recoup[ed] some of the revenue it lost as a result of CWA's

---

(a) Accrued and unpaid rent as of the date of default if the lessee has never taken possession of the goods, or, if the lessee has taken possession of the goods, as of the date the lessor repossesses the goods or an earlier date on which the lessee makes a tender of the goods to the lessor[; and]

(b) The present value as of the date determined under paragraph (a) of the total rent for the then remaining lease term of the original lease agreement minus the present value as of the same date of the market rent at the place where the goods were located on that date computed for the same lease term.

[5]The district court and the parties rely on the comments to the UCC section upon which § 680.527 was based. While the comments may have some persuasive value, the Florida legislature has not adopted them.

-13-

breach." BP Group asserts "[a] 'substantially similar' lease does not mean 'the exact same lease,' but instead means taking 'the steps to cover that a reasonable merchant in like circumstances would take.'" See 3 William D. Hawkland et al., Uniform Commercial Code Series § 2A-518:2 (Rev. 2010)). According to BP Group, the district court's award was proper because (1) the two leases "share vastly more similarities than differences"; (2) the district court correctly determined the agreements were substantially similar, despite the absence of minimum monthly payments in the Priester agreement, because of "BP Group's unrebutted argument that economic conditions rendered such a provision unfeasible"; and (3) "the absence of a monthly minimum in the Priester Agreement is ameliorated to some degree by other contractual provisions."

Damages and the assessment of whether BP Group could have reasonably avoided any of the consequences of CWA's breach are factual determinations under Florida law.[6] See Fisher Island Holdings, LLC v. Cohen, 983 So.2d 1203, 1204 (Fla. Dist. Ct. App. 2008); Graphic Assocs., Inc. v. Riviana Rest. Corp., 461 So.2d 1011, 1014 (Fla. Dist. Ct. App. 1984) ("The doctrine of avoidable consequences, commonly referred to as a duty to mitigate damages, prevents a party from recovering those damages inflicted by a wrongdoer which the injured party 'could have avoided without undue risk, burden, or humiliation.'") (quoting Restatement § 350(1)). See also Fla. Stat. § 671.103 ("[T]he principles of law and equity . . . shall supplement [Florida's adopted UCC] provisions.").

The parties' considerable debate about the similarity of the agreements and BP Group's efforts to mitigate its damages manifest genuine disputes as to material facts. We are unable to agree with the district court that "BP Group's unrebutted argument that economic conditions rendered [a monthly minimum rent] provision unfeasible"

---

[6]Because neither party requested a jury, the district court will ultimately determine these issues.

-14-

undisputably establishes substantial similarity and entitles BP Group to recover "under Fla. Stat. § 680.527, not Fla. Stat. § 680.528" at this stage. While relevant to the analysis, changing economic conditions are more probative of the reasonableness of BP Group's mitigation efforts than of the similarity of the two agreements.

Because genuine disputes remain as to whether the AMA and Priester agreement were substantially similar and whether BP Group otherwise took reasonable steps to avoid unnecessary damages, we reverse the district court's judgment. We express no opinion as to whether Kloeber has waived his present-value argument.

## III.  CONCLUSION

We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

_____