# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 11-2027

_____

Jessica Cockram,

        Appellant,

    v.

Genesco, Inc.,

        Appellee.

\*
\*
\*
\*
\* Appeal from the United States
\* District Court for the
\* Western District of Missouri.
\*
\*
\*

_____

Submitted: November 17, 2011
Filed: June 8, 2012

_____

Before SMITH, COLLOTON, and GRUENDER, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Jessica Cockram sued her former employer, Genesco, Inc., after the company made public statements about Cockram's involvement in an incident in which a pernicious racial slur appeared on a return receipt that Cockram handed to a customer. The district court dismissed Cockram's claim for false light invasion of privacy and granted summary judgment in favor of Genesco on her defamation claim. Cockram now appeals, and we affirm the dismissal of the false light claim and reverse and remand the defamation claim.

## I. BACKGROUND[1]

On October 17, 2008, in the course of her duties at a Journeys retail store owned by Genesco, Cockram assisted Keith Slater, an African-American, with a merchandise return. For efficiency in processing the return, Cockram entered a generic phone number, (913) 555-5555, into the store register. Unbeknownst to Cockram, Richard Hamill, a former employee whom Journeys had fired prior to this incident, had inserted into a store-level database a racial slur as one of the names associated with the phone number Cockram entered. Cockram unwittingly selected the entry with the racial slur from the list of names associated with the phone number. She then printed a return receipt that included the racial slur, signed it without reading it, and handed it to Slater.

The next day, Slater, accompanied by members of his family, returned to Journeys with the return receipt. Slater's sister demanded Cockram's name, and Cockram complied. Slater and his family were outraged about the incident and told people in and near Journeys about what had happened, resulting in what Cockram described as a "riot."

On October 20, Genesco fired Cockram. In response to inquiries about the incident, Genesco provided a statement ("first statement") on October 21, 2008, reading:

> While we are continuing to investigate this incident, it now appears that an employee in one of our stores entered highly inappropriate statements in a form used to process a merchandise return. Needless to say, such an act was not authorized by Journeys, and will not be tolerated. This employee has been terminated.

---

[1]The facts in this opinion are stated in the light most favorable to Cockram. *See Smith v. Arrington Oil & Gas, Inc.*, 664 F.3d 1208, 1212 (8th Cir. 2012).

At Journeys, we pride ourselves on valuing and respecting every customer. We are shocked and sickened that a former associate could be responsible for an act so out of keeping with our culture and our values. We profoundly regret this incident.

Multiple news stories regarding the incident quoted the first statement, and some people posting comments to the online versions of those stories labeled as racist the involved employee. Additionally, after Genesco released the statement, Cockram received numerous messages and calls from people who called her a racist, blamed her for the racial slur, and threatened her. These accusations and threats made Cockram fearful, and she moved out of her apartment and temporarily placed her young child with her parents.

On October 22, 2008, Genesco learned that a different former employee, later identified as Hamill, may have been involved with the return-receipt incident. Genesco determined that the substance of the first statement was valid, but it also issued the following clarifying statement ("clarification"):

> The inappropriate references were entered by employees in the Overland Park store in a store-level customer database. No pre-programmed transaction codes were involved.

> We are currently working to develop mechanisms that allow us to monitor the store-level customer databases more closely than has been possible in the past, in an effort to ensure that nothing like this ever happens again.

Cockram sued Genesco for defamation and false light invasion of privacy based on the content of the first statement and the clarification. The district court granted Genesco's motion to dismiss Cockram's false light claim because it concluded that under Missouri law "there is no cause of action for false light invasion of privacy when recovery is sought for alleged defamatory statements" and that Cockram's false

light claim was "based solely on what she explicitly pleads were defamatory comments." *Cockram v. Genesco, Inc.*, No. 09-01007-CV-W-JTM, 2010 WL 2349064, at *1-2 (W.D. Mo. June 8, 2010) (emphasis omitted). As to the defamation claim, the district court granted summary judgment in favor of Genesco because it determined that Genesco's statements were substantially true. Cockram now appeals both rulings.

## II.    DISCUSSION

Our jurisdiction in this case is based on diversity of citizenship, and the parties agree that Missouri law governs. *See Kaufmann v. Siemens Med. Solutions USA, Inc.*, 638 F.3d 840, 843 (8th Cir. 2011). We must apply Missouri law as declared by the Supreme Court of Missouri. *Council Tower Ass'n v. Axis Specialty Ins. Co.*, 630 F.3d 725, 728 (8th Cir. 2011). "If the Supreme Court of Missouri has not addressed an issue, we must predict how the court would rule, and we follow decisions from the intermediate state courts when they are the best evidence of Missouri law." *Eubank v. Kan. City Power & Light Co.*, 626 F.3d 424, 427 (8th Cir. 2010).

### A.    Defamation

In a defamation action, a plaintiff must establish: "1) publication, 2) of a defamatory statement, 3) that identifies the plaintiff, 4) that is false, 5) that is published with the requisite degree of fault, and 6) damages the plaintiff's reputation." *Missouri ex rel. BP Prods. N. Am. Inc. v. Ross*, 163 S.W.3d 922, 929 (Mo. 2005) (quoting *Overcast v. Billings Mut. Ins. Co.*, 11 S.W.3d 62, 70 (Mo. 2000)). In seeking summary judgment, Genesco argued that Cockram could not establish that the statements were false, that Genesco published them with the requisite degree of fault, and that Cockram's reputation was damaged. The district court addressed only whether the statements were false and determined that they were not. On appeal, Genesco reasserts its arguments that Cockram cannot establish the latter three of the six required elements. *See Shelton v. Kennedy Funding, Inc.*, 622 F.3d 943, 952 (8th

-4-

Cir. 2010) ("We may affirm the district court on any ground finding support in the record."). We now consider the arguments relating to these three elements.

"We review a district court's grant of summary judgment *de novo*, including its interpretation of state law." *Raines v. Safeco Ins. Co. of Am.*, 637 F.3d 872, 875 (8th Cir. 2011). The district court properly granted summary judgment to Genesco if, when viewing the evidence in the light most favorable to Cockram, there is "no genuine issue of material fact" and Genesco "is entitled to judgment as a matter of law." *Clark v. Matthews Int'l Corp.*, 639 F.3d 391, 397 (8th Cir. 2011) (quoting *Schultz v. Windstream Commc'ns, Inc.*, 600 F.3d 948, 951 (8th Cir. 2010)). "A genuine issue of material fact exists if a reasonable jury could return a verdict for" Cockram. *See id.* (quoting *Humphries v. Pulaski Cnty. Special Sch. Dist.*, 580 F.3d 688, 692 (8th Cir. 2009)).

### 1. Falsity of the Statements

We must determine whether the "gist" or "sting" of the statements was false. *See Turnbull v. Herald Co.*, 459 S.W.2d 516, 519 (Mo. Ct. App. 1970). Under Missouri law, a statement is not considered "false" for purposes of defamation simply because it contains an erroneous fact. *Thurston v. Ballinger*, 884 S.W.2d 22, 26 (Mo. Ct. App. 1994) ("A person is not bound to exact accuracy in his statements about another, if the statements are essentially true."). Rather, if a statement is essentially true, such that its divergence from the truth "would have no different effect on the reader's mind than that produced by the literal truth," the statement is not actionable in defamation. *See id.* (quoting *Turnbull*, 459 S.W.2d at 519).

As a preliminary matter, we note that counsel for Genesco conceded at oral argument that the first statement could be read as referring to Cockram and that Genesco knew prior to issuing the first statement that Cockram's name had appeared in news reports. Moreover, Roger Sisson, an officer at Genesco, agreed during his deposition that the words "[t]his employee has been terminated" in the first statement

referred to Cockram. Thus, there is no real dispute that the reference to an "employee" in the first statement could be interpreted as referring to Cockram.

Genesco argues that the first statement was truthful as a matter of law because (1) Cockram did enter a racial slur into a form by selecting it from a list of names, and (2) her action was not authorized because she used a generic phone number, rather than entering Slater's actual information into the register as required by Genesco policy. We are not persuaded. When the entirety of the first statement is considered in the light most favorable to Cockram, it can be read as asserting that Cockram intentionally directed a racial slur at Slater, not just that she violated company policy requiring the entry of a customer's actual phone number to generate a return receipt. In other words, the first statement did not necessarily assert that Cockram was terminated merely because she violated company policy by entering a generic phone number into the register and generating a return receipt containing a racial slur without being conscious of the offensive output. It is not "[n]eedless to say" that Genesco would not authorize entering a generic phone number and blindly selecting a name entry in order to expedite a customer's return. And a reasonable jury may not consider such a practice by itself to be so out of line with Genesco's culture and values as to make Genesco "shocked and sickened." Instead, the use of these phrases in Genesco's statement reasonably could be read to imply that Cockram intentionally communicated the racial slur. Because Cockram denies that she intentionally produced a return receipt with a racial slur, and produced evidence supporting this assertion, a genuine issue of material fact exists as to whether the gist of the first statement was true. Thus, the district court erred by determining as a matter of law that the first statement was substantially true.

Regarding the clarification, Genesco disputes whether that statement referred to Cockram. To the contrary, the first statement reasonably could be read as saying that Cockram entered the racial slur into a form, and the clarification does nothing to indicate that Cockram was not one of the "employees" who entered the racial slur into the database. Furthermore, the clarification used the plural term "employees," and

Genesco has never contended that anyone other than Hamill and Cockram was involved in the return-receipt incident.  Therefore, we conclude that a reasonable jury could find that the word "employees" in the clarification included Cockram.  A jury also could view as false the clarification's statement that Cockram entered the racial slur into a "database."  Even if we were to accept as true that Cockram entered the racial slur into a "form," as stated in the first statement, her selection of the racial slur from a list of names previously stored in a database does not equate to entering the racial slur into the database in the first place.[2]  Indeed, Genesco's investigation revealed that Hamill entered the racial slur into the database.  Thus, the district court erroneously found as a matter of law that the clarification was substantially true.[3]

## 2. *Requisite Degree of Fault*

Genesco argues that Cockram did not present sufficient evidence that Genesco published the relevant statements with actual malice, "that is, with knowledge that the statements were false, or with a reckless disregard as to whether they were true or false," which is the applicable standard if Cockram was a limited-purpose public figure. *See Warner v. Kan. City Star Co.*, 726 S.W.2d 384, 385 (Mo. Ct. App. 1987).  However, if Cockram was simply a private figure, she only needs to show negligence on the part of Genesco, even if Genesco's statement is considered to relate to an issue of "public concern or interest."  *See Englezos v. Newspress & Gazette Co.*, 980

---

[2]Genesco asserts that Cockram did not argue before the district court that the clarification was false based on its statement that Cockram entered the racial slur into a *database,* as opposed to a *form*, and that this argument is therefore waived.  We conclude, however, that Cockram sufficiently argued the falsity of this portion of the clarification before the district court.

[3]Because of our conclusion that there is a genuine issue of material fact as to whether Genesco's statements were false, we do not address "whether 'truth' is an affirmative defense to be proved by defendant, or 'falsity' is an element of the cause of action to be proved by plaintiff." *See Kenney v. Wal-Mart Stores, Inc.*, 100 S.W.3d 809, 814 n.2 (Mo. 2003).

S.W.2d 25, 30-31 (Mo. Ct. App. 1998).  Thus, we must decide whether Cockram was a limited-purpose public figure or, as Cockram contends, a private figure.

In explaining the rationale for the differing burdens borne by public figures and private figures in defamation suits, the Supreme Court noted that public figures are more likely to have access to the media to minimize a defamatory statement's "adverse impact on reputation," and, more importantly, public figures typically "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved," thus "invit[ing] attention and comment." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 344-45 (1974).  The Court did state, however, that, "[h]ypothetically, it may be possible for someone to become a public figure through no purposeful action of his own, but the instances of truly involuntary public figures must be exceedingly rare." *Id.* at 345.  A limited-purpose public figure "is defined as one who 'voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues.'" *Stepnes v. Ritschel*, 663 F.3d 952, 963 (8th Cir. 2011) (quoting *Gertz*, 418 U.S. at 351).  An examination of "the 'nature and extent of an individual's participation in the particular controversy giving rise to the defamation' . . . [allows for a determination of] whether the individual has voluntarily and purposefully injected himself into that controversy in an attempt to influence the resolution of the controversy." *Lundell Mfg. Co. v. Am. Broad. Cos.*, 98 F.3d 351, 362 (8th Cir. 1996) (quoting *Gertz*, 418 U.S. at 352).

Here, Cockram entered a generic phone number into the register that resulted in a racial slur appearing on a return receipt and found herself in the middle of a public controversy.  She did not "voluntarily inject" herself into a preexisting controversy, nor did she knowingly produce the racial slur that initiated the controversy.  It was only after the controversy arose and Genesco blamed Cockram for the racial slur by issuing the first statement that Cockram responded to media inquiries in an attempt to salvage her reputation. *See Hutchinson v. Proxmire*, 443 U.S. 111, 134-35 (1979) (stating that the defendant's argument that the plaintiff was a limited-purpose public figure based on the plaintiff's access to the media was unavailing where, *inter alia*,

the plaintiff's access to the media occurred after the alleged libel). When Cockram ultimately did agree to be interviewed, she insisted that her name not be used, thus indicating an intent to defend her reputation among those who knew that she was the subject of the reports while avoiding any additional exposure among those unaware of her involvement in the incident. And, even though Cockram succeeded in gaining some access to the media, the more important point is that she did not voluntarily place herself at the center of controversy, but merely found herself there. *See Gertz*, 418 U.S. at 344-45 ("More important than the likelihood that private individuals will lack effective opportunities for rebuttal, there is a compelling normative consideration underlying the distinction between public and private defamation plaintiffs. . . . [Public figures] invite attention and comment."). Thus, we conclude that Cockram was a private figure, not a limited purpose public figure. Because private figures need only show negligence to recover for defamation, and Genesco does not argue that Cockram failed to produce sufficient evidence of negligence, Genesco's argument for affirmance based on the "requisite degree of fault" element fails.

### 3. *Damages to Cockram's reputation*

Under Missouri law, "proof of actual reputational harm is an absolute prerequisite in a defamation action." *Kenney v. Wal-Mart Stores, Inc.*, 100 S.W.3d 809, 817 (Mo. 2003). Because "rules of *per se* and *per quod*" defamation do not apply in Missouri, a plaintiff must always prove actual damages. *Id.* at 815. "To demonstrate actual damages [in Missouri], plaintiffs must show that defamatory statements caused a quantifiable professional or personal injury, such as interference with job performance, psychological or emotional distress, or depression." *Arthaud v. Mut. of Omaha Ins. Co.*, 170 F.3d 860, 862 (8th Cir. 1999). "[T]he question of whether a plaintiff's damages were caused by the defamatory statement is for the jury to decide," *Topper v. Midwest Div., Inc.*, 306 S.W.3d 117, 130 (Mo. Ct. App. 2010) (quoting *Johnson v. Allstate Indem. Co.*, 278 S.W.3d 228, 235 (Mo. Ct. App. 2009)), unless a court can determine that a plaintiff failed to meet her burden of production, *see Nazeri v. Mo. Valley Coll.*, 860 S.W.2d 303, 314 (Mo. 1993).

Genesco argues that it is entitled to summary judgment because Cockram "failed to present any evidence that Genesco's statements caused her reputational damage and cannot differentiate between damages that she allegedly sustained as a result of Genesco's statements and damages resulting from the media's coverage of the receipt incident before Genesco published any statements." When the facts are viewed in the light most favorable to Cockram and all reasonable inferences are made in her favor, *see BP Group, Inc. v. Kloeber*, 664 F.3d 1235, 1239 (8th Cir. 2012), the evidence is sufficient to allow a reasonable jury to find actual reputational harm flowing from Genesco's statements.

Cockram argues that there are multiple pieces of evidence indicating that her reputation was harmed by Genesco's statements. She stated that "[p]eople posting comments to media stories carrying Genesco's statement would call me racist." For example, one person writing a comment in response to an online article containing Genesco's first statement said that a "racist teenager entered the words on their [sic] own" and was "rightfully fired." Cockram also received numerous messages containing threats and accusations of racism after Genesco released the first statement. Cockram claims that these "accusations and threats made [her] afraid and [she] moved out of [her] apartment and placed [her] child with [her] parents temporarily." Cockram's father confirmed that Cockram was so concerned about the threats that she asked him to allow her daughter to live with him for a period. Furthermore, Cockram's father stated that his family's friends and acquaintances contacted him and questioned whether Cockram was racist after the stories with Genesco's statements appeared. Thus, we cannot say as a matter of law that Cockram cannot show actual reputational harm.[4]

---

[4]Although we do not assume damages, one certainly can suffer severe reputational harm if accused of a racist act. *See Rush v. Perryman*, 579 F.3d 908, 912 (8th Cir. 2009) (noting that a government employee's constitutionally protected liberty interests can be implicated when an employer accuses an employee of an act involving racism, an accusation that can be "so damaging as to make it difficult or impossible for the employee to escape the stigma of [that] charge[]" (quoting *Winegar*

Genesco relies on *Kenney v. Wal-Mart Stores, Inc.* in arguing that even if Cockram can demonstrate that she incurred reputational harm, she cannot differentiate between harm from Genesco's statements and any harm from the news reports that did not include Genesco's statements. In *Kenney*, the plaintiff initially had prevailed at trial on her claim that a poster was defamatory during a portion of the time that it was displayed. 100 S.W.3d at 811. The defendant appealed, and the court noted that it appeared that the plaintiff failed to distinguish the harm from the poster at issue from the harm resulting from a television broadcast, ninety-nine identical posters, and the poster at issue when it was displayed at a time that the information was accurate. *Id.* at 818. However, the court also noted that the plaintiff "felt that the injury to her reputation from the poster was 'equally painful and devastating' to that of the television broadcast'" and "believed 'they [were] the same kind of injury.'" *Id.* at 812 (alteration in original). The court then observed that a prior decision "denied recovery because the plaintiff 'could not differentiate between the damages, if any, attributable to the defendant and the damages attributable to [a third person].'" *Id.* at 818 (quoting *Taylor v. Chapman*, 927 S.W.2d 542, 544 (Mo. Ct. App. 1996)). Ultimately, however, the *Kenney* court remanded for a new trial, rather than reversing, stating that although "Kenney may face substantial obstacles in meeting her burden of proof on retrial," it could not "say that it is impossible for her to present a submissible case."[5] *Id.*

Cockram is in a better position to delineate the source of her reputational harm than was the plaintiff in *Kenney*. For example, comments to online news stories containing portions of Genesco's first statement provide evidence that some readers

*v. Des Moines Indep. Cmty. Sch. Dist.*, 20 F.3d 895, 899 (8th Cir. 1994))).

[5]The *Kenney* court held that the jury instruction regarding the question of damages was erroneous. *Kenney*, 100 S.W.3d at 814. Thus, we recognize that the *Kenney* court may not have viewed as sufficient the showing the plaintiff made at the original trial, but remanded, rather than reversing, to allow the plaintiff to present different evidence in light of a proper jury instruction.

viewed Cockram as a racist after reading Genesco's statement. Additionally, in contrast to the plaintiff in *Kenney*, Cockram did not suggest that Genesco's statements placing blame on her inflicted the "same kind of injury" as the generic news stories covering the incident. Indeed, a news story that includes Genesco's statement placing blame on Cockram is likely to cause a greater degree of harm to reputation than one simply providing general information about the incident. Finally, Cockram's receipt of personal threats and messages accusing her of racism *after* Genesco released its statements (where Genesco points to no instances in the record of Cockram receiving such personal messages before Genesco's first statement despite three prior days of news coverage) also supports her causation argument. Under these circumstances, a reasonable jury could conclude that at least some of the reputational harm Cockram suffered resulted from Genesco's statements blaming her for using the racial slur as opposed to news stories that did not mention Genesco's statements. *See Topper*, 306 S.W.3d at 129-30 (determining that a "jury may well have inferred" that false statistics "played a role in the removal" of the plaintiff from his position when the statistics were published prior to his termination and made his management "look very bad," even though other negative statements were made about the plaintiff that could have contributed to the loss of his job). Accordingly, we cannot say that a properly instructed jury will be unable to address reasonably the question of causation. *See Kenney*, 100 S.W.3d at 818 (stating, where there is evidence that some harm may have been caused by a non-actionable statement, that a jury should be instructed to attribute liability to a defendant only for loss allocable to an actionable statement). Therefore, we decline to affirm on this ground.

In sum, Cockram is a private figure and a reasonable jury could conclude that Genesco's statements were false, that they harmed Cockram's reputation, and that this harm was distinguishable from any harm flowing from the generic news stories. Hence, the district court erred by granting summary judgment to Genesco on Cockram's defamation claim.

## B.    False Light Invasion of Privacy

Cockram argues that the district court erred in holding that Missouri does not recognize a cause of action for false light invasion of privacy when a claim is premised solely on alleged defamatory statements. We review *de novo* the dismissal of Cockram's claim, "accepting the allegations contained in the complaint as true and drawing all reasonable inferences in favor of the nonmoving party." *Express Scripts, Inc. v. Aegon Direct Mktg. Servs., Inc.*, 516 F.3d 695, 698 (8th Cir. 2008) (internal citation omitted). We agree with the district court that Missouri would not recognize Cockram's claim for false light invasion of privacy under the facts of this case.

In *Sullivan v. Pulitzer Broadcasting Co.*, the Missouri Supreme Court observed that it had "not yet recognized a cause of action apart from defamation for a 'false light' invasion of privacy." 709 S.W.2d 475, 478 (Mo. 1986). The *Sullivan* court noted that "[m]any questions now surround the 'false light' theory, one of which is whether such an action is even necessary." *Id.* It further observed that "the 'false light' theory under [Restatement (Second) of Torts] § 652E resembles a defamation suit because each action requires the publication of *false* information." *Id.* (emphasis added) (footnote omitted). In fact, *Sullivan* stated that "[t]he only apparent difference between false light and defamation is that the latter protects one's *interest* in his or her reputation, while the former protects one's *interest* in the right to be let alone." *Id.* at 479 (emphasis in original) (quotation omitted). Ultimately, the court declined to recognize a separate tort for false light invasion of privacy under the facts of the case. *Id.* at 480-81. Cockram, however, latches on to the fact that the court did hypothesize about factual scenarios that could potentially justify recognition of the tort in the future. *Id.* at 480.

To determine whether Missouri would view Cockram's allegations as stating a claim for false light invasion of privacy, it is helpful to examine the facts and rationale of *Sullivan*. In *Sullivan*, the plaintiff alleged that news broadcasts conveyed the false impression that the plaintiff, who was then a city employee, improperly

-13-

arranged for an architect employed by the city to prepare plans for the plaintiff's home and was building the home with materials stolen from the city. *Id.* at 475. The court stated that it was "not confronted with a situation where a party alleges that another has created a false impression in the public eye" and that the case was "nothing more than the classic defamation action where one party alleges that the other published a false accusation concerning a statement of fact." *Id.* at 481. Furthermore, the court determined that the plaintiff's substitution of "the word 'false' for the phrase 'false impression'" and an allegation of "an injury to reputation" with one for "an injury to his reputation and an injury to his right to be let alone" was insufficient to treat the "claim as anything other than a defamation action." *Id.*

In *Nazeri v. Missouri Valley College*, the Missouri Supreme Court affirmed its commitment to *Sullivan* by declining to recognize a false light claim premised on statements accusing a state employee of being prejudiced against a religious college, being "opposed to church schools having education programs," and leaving her husband and children to live with a homosexual. 860 S.W.2d at 306-07, 317. The court labeled the claim as a "classic defamation action." *Id.* at 317 (quoting *Sullivan*, 709 S.W.2d at 481).

With an understanding of these Missouri Supreme Court cases, we now turn to the complaint in the present matter. In its false light count, Cockram's complaint states that Genesco created a "false impression" with knowledge or reckless disregard of its "falsity." Just as in *Sullivan*, the mere use of the words "false impression" is not sufficient to convert the claim to one of false light invasion of privacy. *See Sullivan*, 709 S.W.2d at 481. In addition, the complaint's paragraph alleging harm for the false light claim alleges "loss of reputation" and is a verbatim copy of the paragraph alleging harm for the defamation count. Thus, Cockram sought to recover on her false light count for *untrue statements* that caused *injury to her reputation*. *Nazeri* indicates that such an action is properly one for defamation, not false light invasion of privacy. *See Nazeri*, 860 S.W.2d at 317 ("Recovery for untrue statements that cause injury to reputation should be in defamation."). Moreover, the allegedly false statements at

issue in *Sullivan* and *Nazeri* are similar to the statements at issue here in that they could lead people to believe that the respective plaintiffs had serious professional and personal faults. Likewise, one would expect harm to reputation and privacy interests in this case to be similar to that in *Sullivan* and *Nazeri*.

We conclude that the material features of Cockram's false light claim are indistinguishable from the features of the claims in *Sullivan* and *Nazeri* that were not recognized as false light claims. Because we are bound to follow decisions of the Supreme Court of Missouri that sufficiently address the issue before us, we need not determine whether the Supreme Court of Missouri would recognize a false light claim in a case such as *Meyerkord v. Zipatoni Co.*, 276 S.W.3d 319 (Mo. Ct. App. 2008), a Missouri court of appeals case that Cockram relies on, or other hypothetical situations. *See Gage v. HSM Elec. Prot. Servs., Inc.*, 655 F.3d 821, 826-27 (8th Cir. 2011) (stating that it was unnecessary to consider cases from the state court of appeals in view of applicable precedent from the state supreme court). Therefore, we agree with the district court that Missouri would not recognize Cockram's false light claim.

## III.   CONCLUSION

For these reasons, we affirm the district court's dismissal of Cockram's false light invasion of privacy claim, but we reverse the grant of summary judgment in favor of Genesco as to Cockram's defamation claim and remand for further proceedings.

_____