Garo LAUDERBACK, Appellee,

v.

AMERICAN BROADCASTING COMPANIES, INC., Appellant.

No. 83–2381.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 17, 1984.

Decided Aug. 21, 1984.

Stephen F. Avery of Cornwall, Avery, Bjornstad & Scott, Spencer, Iowa, David J. Stein, Milford, Iowa, for appellee.

Don H. Reuben, William J. Campbell, Jr., Mark Sableman, Reuben & Proctor, Chicago, Ill., Iris E. Muchmore, Charles M. Peters, Simmons, Perrine, Albright & Ellwood, Cedar Rapids, Iowa, for appellant American Broadcasting Companies, Inc.

Before LAY, Chief Judge, and HEANEY and BOWMAN, Circuit Judges.

LAY, Chief Judge.

The American Broadcasting Companies, Inc. (ABC), appeals from the denial of its summary judgment motion in a libel action brought by Garo Lauderback. The district

court[1] found that material factual issues remained to be resolved and that the record did not support ABC's assertion that the allegedly libelous telecasts were privileged communications. The court certified its order to this court under 28 U.S.C. § 1292(b). Because we conclude that any inferences relating to Lauderback were protected expressions of opinion, we reverse and remand to the district court with directions to grant ABC's motion for summary judgment.

*Facts*

In 1980, after receiving complaints from senior citizens in Emmet County, Iowa, John Martens, the county attorney, decided to conduct an investigation into fraud in the sale of medical and hospital policies of insurance to senior citizens. Martens wanted to videotape the sales presentations of some insurance agents, allegedly for preservation of evidence to be used in any subsequent proceedings. Martens solicited the aid of ABC and CBS. Charles Thompson, one of the producers of ABC's 20/20 program, eventually agreed to help. Martens also solicited the assistance of a Des Moines television station, WHO–TV, and of Iowa Insurance Commissioner Bruce Foudree who at that time was working on a similar undercover insurance investigation.

Martens and his staff recruited senior citizens to act as "decoys" and to request information from insurance agencies. Martens chose the agencies to be contacted[2] and sent letters out in the names of his recruits. One of these letters was sent to Michael Crawford, a general agent who at that time employed Garo Lauderback.[3]

Crawford sent Lauderback to discuss insurance with Carl and Dagney Matheson, two of Martens's recruits. Martens had arranged for this meeting to be videotaped by ABC's crew. During the course of the presentation, Lauderback made several statements about his insurance policies, some of which were made without knowledge of the subject matter and some of which were admittedly false.

Several weeks before the date on which ABC was to air the videotape on its 20/20 program, Thompson contacted Lauderback to get a statement. This was the first time Lauderback was informed about the videotaping. Thompson later received a phone call from Mrs. Lauderback commenting on her husband's actions subsequent to the videotaping. No further calls were exchanged between Thompson and the Lauderbacks.

ABC aired a portion of the videotape of Lauderback on its May 14, 1981, broadcast of the show 20/20. On June 19, 1981, Lauderback filed suit against ABC alleging that the May 14 broadcast of the show and the next week's show (which also had a report on insurance fraud but did not mention or show Lauderback) libeled him.[4]

During discovery, 12 depositions were taken. On January 12, 1983, ABC filed its motion for summary judgment basing its request on two theories: (1) all the statements of fact made about Lauderback were true and other statements were protected as opinion, and (2) the broadcast was privileged as a report of an official government investigation. The district court denied ABC's motion. The court found that genuine issues of material fact needed to be resolved and that the official report privilege extended only to official actions that have been made a matter of public record. Upon application, the matter was then certified for an interlocutory appeal under

1. The Honorable Edward J. McManus, Chief Judge, United States District Court for the Northern District of Iowa, presiding.

2. Martens chose to contact agents who had had complaints made about them to the Iowa Insurance Department.

3. On Sept. 30, 1980, the Iowa Insurance Department filed a charge against Crawford on the basis of a complaint about life insurance sold to an elderly woman. According to Crawford's deposition, the charge was later dropped.

4. In his brief, Lauderback does not discuss the broadcast of May 21. We conclude that he is not relying on representations made in that broadcast and, thus, we confine our discussion to the May 14 broadcast.

§ 1292(b) and this court granted the motion.[5]

The relevant portion of the broadcast began with a picture of a newspaper headline which read "Emmet Grand Jury Indicts Two Iowa Insurance Agents." While the headline was on the screen, a voice-over stated: "The fact that most policies do not cover extended nursing home care has received some publicity." The next picture shown was that of Lauderback during which showing the announcer stated: "So the agents just say, 'Oh, it's the other guys who are doing the stealing.'" Following this statement, a portion of the tape made of Lauderback at the Matheson's house was shown. On this tape, Lauderback states that a director of a local nursing home had on another occasion verified that Lauderback's insurance policy would pay for care at the facility. The next segment shows a brief interview with the nursing home director during which he denies ever having spoken to Lauderback. The final reference to Lauderback is a statement by the announcer toward the end of the segment that "Mr. Lauderback is currently under a formal investigation."

The broadcast at several points shows criminal proceedings against other Iowa insurance agents. During the broadcast epithets such as "rotten," "unethical," and "sometimes illegal" are used to describe the practices of agents who sell worthless policies to senior citizens. The agents themselves are referred to as "crooks" and "liars."

On appeal, Lauderback contends that the 20/20 broadcast, on the whole, characterized him as a crook and a liar. Lauderback argues that these characterizations, although untrue, were presented as facts or, alternatively, that they were represented as opinions which appeared to be based on undisclosed facts. Because we conclude that statements made by ABC which related to Lauderback are protected opinion, we reverse the district court's denial of ABC's motion for summary judgment.

Discussion

■ The traditionally state-regulated area of defamation has in the past 20 years become increasingly dominated by the federal Constitution. With *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) and *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the United States Supreme Court has declared that First Amendment safeguards are available to media defendants in defamation actions. It is true that not all statements by the media are insulated from attack as defamatory, *see, e.g., Time, Inc. v. Firestone*, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976); however, the publication of truthful, nonprivate facts and of pure opinion is protected by the First Amendment. *Cf. Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339, 94 S.Ct. 2997, 3006, 41 L.Ed.2d 789 (1975); *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 489–90, 94 S.Ct. 2997, 3006, 41 L.Ed.2d 789 (1974).

■ A difficult question is presented when one statement may be interpreted as either fact or opinion. While the right of free speech provides absolute protection to statements which are purely opinions, *Gertz v. Welch*, 418 U.S. at 339–40, 94 S.Ct. at 3006–07, it is conceded that statements clothed as opinion which imply that they are based on undisclosed, defamatory facts are not protected. This stricture on publication of opinion rests on the assumption that, given all the facts of a situation, the public can independently evaluate the merits of even the most outrageous opinion and discredit those that are unfounded. On the other hand, when an opinion held out for belief is stated so that the average listener would infer that the speaker had an undisclosed factual basis for holding the opinion, the listener does not have the tools necessary to independently evaluate the opinion and may rely on unfounded opinion

---

**5.** Although the trial court granted certification specifically on the issue of fair report privilege, on appeal, all issues are before this court. *The*

*Board of Managers of the Arkansas Training School for Boys v. George*, 377 F.2d 228, 231 (8th Cir.1967).

that defames an individual. Thus, the Constitution contains safeguards which protect both the right to publish opinions and the right of a private individual to be protected from unfounded statements clothed as fact.

Lauderback first contends that ABC's broadcast stated as a fact that he was a criminal or had been indicted on criminal charges. Lauderback apparently asserts that the successive showing of the newspaper headline regarding the indictment of two Iowa insurance agents and then the picture of Lauderback gave rise to the inference that Lauderback himself was one of the indicted agents. However, this purportedly misleading juxtaposition was quickly clarified when the two agents who actually were indicted were named and discussed. Also, at the end of the broadcast, the program's announcer stated that Lauderback was "currently under a formal investigation." We find that the average viewer would conclude from this that Lauderback had not yet been indicted or convicted of a crime.

Lauderback next argues that the "gist" or "sting" of the broadcast was that he was a crook or liar. We agree that, given the broadcast as a whole, Lauderback was portrayed as a less than honest or scrupulous insurance agent. However, we conclude that this portrayal indicated ABC's opinion of Lauderback's dealings and not a bald accusation of criminal activity.[6]

In *Lewis v. Time Inc.*, 710 F.2d 549 (9th Cir.1983), the Ninth Circuit was presented with a similar situation. Lewis was a practicing attorney who found himself the subject of a segment of a Time Magazine article. The article, entitled "Those #*§!!! Lawyers," stated in relevant part:

If the legal profession has been reluctant to discipline its shadier practitioners, it has been swift to crack down on anyone threatening to cut fees or reduce business.

\* \* \* \* \* \*

Under these circumstances, it is hardly surprising that some Americans have grown cynical about lawyers—and the law. What is more, every day's newspaper offers up fresh horror stories.... Thanks to painfully slow bar discipline, a northern California lawyer named Jerome Lewis is still practicing law despite a $100,000 malpractice judgment against him in 1970 and a $60,000 judgment including punitive damages in 1974 for defrauding clients of money....

*Lewis v. Time* at 550–51. Lewis sued Time alleging that the readers of the article would draw negative inferences about him, that is, they would infer that he was going to be disbarred. He claimed, as does Lauderback in the instant case, that the statements about him were understood alternatively as fact or as opinion which appeared to be based on undisclosed fact.

The Ninth Circuit rejected Lewis's argument that the article indicated that disbarment was a foregone conclusion. However, the court concluded that even if the article did imply this, the implication was no more than an "outsider's prediction of the uncertain outcome of a future adjudication," *id.* at 552, and was protected opinion: "The inference that Lewis's morality or legal abilities were doubtful, or that he was unreliable and disreputable, is a broad, unfocused, wholly subjective comment, not the kind of factual expression for which the Constitution permits liability to be imposed." *Id.* at 554. Time's full disclosure of the true facts supporting its accusation brought the statements within the safeguards of the First Amendment.

Lauderback seeks support from *Cianci v. New Times Publishing Company*, 639 F.2d 54 (2nd Cir.1980). In *Cianci*, the defendant magazine printed an article about Cianci, who was seeking reelection as Mayor of Providence, Rhode Island. The article stated that Cianci had been accused of rape 12 years earlier and included an interview with the alleged victim, recounting

---

**6.** It is for the court to decide whether a statement is fact or opinion. *See Old Dominion Branch No. 496, National Association of Letter*

*Carriers v. Austin,* 418 U.S. 264, 283–84, 94 S.Ct. 2770, 2780–81, 41 L.Ed.2d 745 (1974).

her attack. The article contained the statement that the State Crime Law expert who had conducted the lie detector tests believed that the report on the tests showed "one of the most clear cut cases of rape he had ever processed." *Id.* at 57. The article continued with an explanation that the charge had been dropped and that the district attorney had decided not to prosecute due to lack of evidence which, according to the article, stemmed from a settlement between the alleged victim and Cianci. The article concluded with the statement that "[f]or the nominal sum of $3,000, Cianci had managed to buy his way out of a possible felony charge." *Id.* at 58.

The Second Circuit found that a jury "could surely conclude that New Times was saying that Mayor Cianci, instead of being the man of character he represented himself to be, was in fact a rapist and an obstructor of justice—not simply a person who had been accused of being such." *Id.* at 60. The court found that the article represented as fact the rape and Cianci's settlement with the complainant. The article also contained quotes from others who represented as fact Cianci's involvement in the rape. The court further found that a reasonable reader of the article would infer that Cianci had paid a $3,000 settlement to the complainant *before* the criminal charges against him had been dropped. The truth was that the criminal charges first were dropped due to lack of evidence and then Cianci made an offer of settlement to the complainant evidently to preempt a civil suit by her.

The court of appeals rejected the argument that these statements were protected as pure opinion. Such privilege, the court reasoned, does not exist for "a charge which could reasonably be understood as imputing specific criminal or other wrongful acts." *Id.* at 64. The fair comment privilege also did not apply, the court rea-

soned, because "charges of specific criminal misconduct" are not "comment." Also, the court found that the facts of the article and any opinions stated therein were inextricably intertwined and in such a case, "it is meaningless to say that the opinion is protected, when the facts are not." *Id.* at 67.

While allegations of specific criminal conduct generally cannot be protected as opinion, broad brush-stroked references to unethical conduct, even using terms normally understood to impute specific criminal acts, may be understood by the reasonable viewer as opinion. *See, e.g., Old Dominion Branch No. 496, National Association of Letter Carriers v. Austin,* 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974) (use of the term "traitor" understood to imply no specific criminal conduct); *Greenbelt Cooperative Publishing Association, Inc. v. Bresler,* 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970) (same for the term "blackmail"). In the instant case, we find that the impression left by the broadcast, that Lauderback was dealing unscrupulously with senior citizens, is more analogous to a "broad, unfocused, wholly subjective comment" than it is to specific accusations of felonious conduct.[7] We conclude that a reasonable viewer of the 20/20 broadcast would have recognized that inferences raised about Lauderback's honesty or about the truthfulness of his statements were opinions and not legal conclusions. While the television medium particularly must be aware that grouping actual criminals with innocent persons may convey an inference of guilt for all, we do not feel media reporting can be unduly restrained in showing the facts and disclosures of an ongoing or completed investigation. We conclude that the broadcast as a whole may have indicated that ABC believed Lauderback to be guilty of unethical behavior. However, any representation of

---

7. There is no dispute that the tape was a valid representation of Lauderback's meeting with the Mathesons and that Lauderback did not speak to the nursing home director. It is uncontested that prosecutor Martens was considering bringing charges against Lauderback for a sale which was referred to on the videotape. Martens also stated in his affidavit that an administrative investigation was being conducted at the time of the broadcast by the Insurance Commissioner's office.

such was understandable as opinion and not fact.

Our analysis of Lauderback's claim of defamation does not end by finding that the relevant statements were opinion. As we earlier have noted, opinion which purports to be based on undisclosed facts is not protected speech. Lauderback argues that ABC had knowledge before the date of the broadcast that no criminal charges would be brought against him. He argues that the writers had a duty to disclose this fact in order that the negative statements regarding Lauderback could be evaluated accurately by the viewing public.

Although uncontradicted statements by Martens indicated that he had decided by May 14, 1981 not to prosecute Lauderback for his dealings with the Mathesons, there remained a question as to whether Martens would pursue the criminal prosecution of Lauderback for his dealings with another client. Thus, ABC had grounds to believe that Lauderback might be prosecuted for some actions relating to insurance sales to senior citizens. We also point out that not all information favorable to the plaintiff need be disclosed as the basis of a published opinion. *Cf. Brown v. Herald Co., Inc.*, 698 F.2d 949 (8th Cir.1983). We think that a viewer would reasonably conclude that had Lauderback actually been indicted by the date of the broadcast such information would have appeared in the program. By its very nature, a media investigation of an industry conveys the message that all negative facts relevant to the topic will be revealed. In the instant case, the factual bases for the inferences raised about Lauderback were revealed. The videotape of Lauderback, the interview of the nursing home director, and the statement by the Insurance Commissioner regarding the sale of insurance to the elderly, in general, formed the bases of the opinions in the broadcast. No undisclosed facts existed which were necessary for the viewers to be able to independently evaluate the opinions expressed.

We acknowledge that summary judgment is an extraordinary means of disposing of an action and, thus, should be used only when no factual disputes cloud the legal issue presented. This court has held that summary judgment may be "particularly appropriate" in an action for defamation. *Truetlen v. Meredith Corp.*, 455 F.2d 255, 257 n. 1 (8th Cir.1972). Where the court determines that the allegedly defamatory statements are opinion and that the plaintiff can point to no undisclosed facts which would substantially alter the average listener's interpretation of the opinion, summary judgment for the defendant is warranted.

We therefore reverse the district court's denial of ABC's motion for summary judgment and remand the case to the district court for proceedings in accordance with this opinion.

Each party to pay its own costs.