B. Libel Per Quod
Count Two of the Complaint alleges Defendants defamed all Plaintiffs through the airing of a series of broadcasts stating or implying various questionable business dealings with Gregory, including alleging the unlawful altering of the price term of a home-repair contract without Gregory's knowledge or consent and seeking liquidated damages based on that price term.
Under Iowa law, a plaintiff must prove five elements in order to prevail on a libel per quod claim: (1) publication, (2) of a false, defamatory statement, (3) concerning the plaintiff, (4) with the appropriate level of fault, (5) resulting in demonstrable injury. See Johnson v. Nickerson , 542 N.W.2d 506, 511 (Iowa 1996). Defendants dispute each element save publication, and make four arguments as to why Plaintiffs cannot prevail as a matter of law. First, the news reports were substantially true; second, the allegedly defamatory statements were nonactionable opinion; third, Plaintiffs cannot show the required degree of fault; and fourth, Plaintiffs cannot show the required degree of injury.[3]
1. True or Substantially True
Defendants contend the alleged libelous statements were in fact true or substantially true. Defendants do not contest the *892 statements are capable of bearing a defamatory meaning, as the news reports surely are, but only that the First Amendment nonetheless protects those statements from being actionable.
A libel per quod plaintiff must prove the falsity of a statement to prevail. Nickerson , 542 N.W.2d at 511 n.3 ; Vojak v. Jensen , 161 N.W.2d 100, 108 (Iowa 1968). A plaintiff must show that a report is substantially untrue, and "slight inaccuracies" are insufficient "provided the defamatory charge is true in substance." Yates v. Iowa W. Racing Ass'n , 721 N.W.2d 762, 769-70 (Iowa 2006). Iowa courts examine the "gist" or "sting" of a publication to determine its substantial truth. Campbell v. Quad City Times , 547 N.W.2d 608, 610 (Iowa App. 1996) (citing Behr v. Meredith Corp. , 414 N.W.2d 339, 342 (Iowa 1987) ). If the underlying facts are undisputed, the substantial truth of a publication is a matter of law for the Court to determine. Id. ; see also Smith v. Des Moines Pub. Schs. , 259 F.3d 942, 947 (8th Cir. 2001).
Helpfully, the parties largely agree on what the "gist" of the WHO-TV broadcasts were, and the Court agrees as well: Nelle unlawfully altered the contract with Gregory after she signed it and without her consent, adding a price term that changed the amount she owed. See ECF No. 57 at 7; ECF No. 58 at 4. The parties do not agree about the truth of that report. In these circumstances, the truth or substantial truth of the statement is decidedly not a matter for the Court, but for the trier of fact.
Nelle's claim that the contract was not altered and that the price term was filled in with Gregory's knowledge and consent, is supported by ample record evidence to find a genuine dispute of material fact. Nelle has, both in his deposition and in his statements to Brilbeck, stated that he discussed the terms of the contract with Gregory; that he went back to her house when the scope of insurance arrived; and that he filled in the price terms on the contract on his document with Gregory present. ECF 47-3, 45:15-46:11; ECF No. 54-2, 18:17-18. There is text message evidence suggesting that Gregory and Nelle were in communication about the scope of insurance and intended to meet and discuss it. ECF No. 54-6. The third WHO-TV broadcast itself explained, in a shift from the previous two, that Nelle went to Gregory's house to work with the insurance adjustor to find damages, providing further support for Plaintiffs' version of events that Gregory was present when Nelle filled in the price terms. ECF No. 47-1 ¶ 70.
Further, the contract was a contingent contract, and obligated Gregory to pay only if the insurance company agreed to pay, with Gregory liable only for her deductible. That the contract included a "blank" price term, contingent on the scope of insurance given by the insurance company, does not necessarily mean that the contract was not otherwise valid in obligating Gregory to pay the insurance proceeds. To the extent that the contract was one for "the scope of insurance" rather than for a specific amount, filling in the price term later did not, in fact, change what Gregory was obligated to pay.
And contrary to the September WHO-TV broadcasts, the record contains no evidence to support the statements that Nelle or Roof One Exteriors submitted the yellow copy of the contract, with the scope of insurance numbers filled in, to Gregory's insurance company first. ECF No. 47-1 ¶¶ 53, 56. This would have been impossible, because the filled-in numbers came from the insurance company itself.
Therefore, the "gist" of the story-that Nelle altered the contract unlawfully and without Gregory's knowledge by adding *893 thousands of dollars of work-is disputed by Plaintiffs.
Defendants' arguments that the news stories were true are not sufficient to warrant summary judgment. The fact that the contract was possibly not compliant with the law in some areas, as is suggested by the AVC (and that Nelle conceded he may have violated in his deposition) are not related to the "gist" of the WHO-TV broadcasts. Instead, these violations involve tertiary issues such as providing proper contact information, or the font and sizing of withdrawal rights. ECF No. 47-15 ¶¶ 8-11. Whether Roof One Exteriors committed these other violations in dealings with Gregory, is not relevant to the "gist" of the WHO-TV broadcasts. Further, the Iowa Attorney General's investigation and the AVC would not be binding on a fact-finder. Even if the AVC is some evidence of the substantial truth of Defendants' story, it cannot defeat summary judgment simply by its presence. Had Plaintiffs admitted misconduct in the AVC, circumstances may be different, but in fact Plaintiffs expressly denied any wrongdoing. ECF No. 47-15 ¶ 12.
Defendants' citations to persuasive authority contain crucial difference in factual circumstances. In Jaillett v. Georgia Television Co. , 238 Ga.App. 885, 520 S.E.2d 721, 725 (1999), for example, the underlying facts of the "gist" in that case were "uncontradicted" and "undisputed." As a result, the court had no trouble finding that the statements were protected opinion. Jaillett , 520 S.E.2d at 725. The same is true in RainSoft v. MacFarland , 2018 WL 4696737, at *6 (D.R.I. Sept. 30, 2018), when the court explained "RainSoft has not genuinely challenged MacFarland's account" of the underlying allegedly deceptive practices. Here, instead, Plaintiffs dispute the truth of the "gist" of the WHO-TV broadcasts that the contract was unlawfully altered without Gregory's knowledge.
2. Fact or Opinion
Defendants contend specific statements in the broadcast are protected as opinion under the First Amendment. These statements include, in the first broadcast, the terms "conned," "cheat," "scam," and "bilked," and in the second broadcast, references to Nelle's actions as "fraud" and "illegal."[4] ECF No. 47-12.
Opinion receives broad protection under the First Amendment doctrines articulated in Gertz , 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789, and Milkovich v. Lorain Journal Co. , 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990). When the underlying facts are truthful, a speaker's opinion is protected from liability for defamation. Milkovich , 497 U.S. at 18--19, 110 S.Ct. 2695.
The Eighth Circuit has thoroughly explained when and why opinion is, and is not, protected. Lauderback v. Am. Broad. Cos. , 741 F.2d 193, 195 (8th Cir. 1984). As then-Chief Judge Lay noted, opinion is protected because "given all the facts of a situation, the public can independently evaluate the merits of even the most outrageous opinion and discredit those that are unfounded." Id. Opinion based on undisclosed facts is not protected because "the listener does not have the tools necessary to independently evaluate the opinion." Id. It follows that, when the underlying facts are disclosed, but false, they can no more provide the necessary tools for evaluation than if they were not disclosed at all.
In this case, whether and how the work contract was "altered," and whether Nelle *894 filled in the price terms alone or with Gregory's knowledge and consent, are questions of fact. The "gist" of the WHO-TV broadcasts is therefore rooted in an actionable statement of fact, regardless of other characterizations in the broadcast. As Judge Sack notes, "if an opinion is based on a falsely stated allegation of fact, of course, the false allegation would not receive protection." 1 Robert D. Sack, Sack on Defamation : Libel, Slander, and Related Problems § 4:3.2 (5th ed. 2017) [hereinafter Sack on Defamation ].
With that in mind, is an opinion subject to liability when it is made on the basis of disclosed, but provably false or defamatory facts? As Lauderback suggests, the answer is yes. Iowa law is even clearer, and the Iowa Supreme Court repeated this point just this year: "[S]tatements of opinion can be actionable if they imply a provable false fact, or rely upon stated facts that are provably false ." Bandstra v. Covenant Reformed Church , 913 N.W.2d 19, 47 (Iowa 2018) (emphasis added) (quoting Yates , 721 N.W.2d at 771 ); see also ECF No. 50 at 21-22. "Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact." Milkovich , 497 U.S. at 18-19, 110 S.Ct. 2695.
Here, Plaintiffs dispute the truth of the underlying facts. Even if Defendants are correct that some individual statements from the broadcast, such as "cheated" or "bilked," are generally opinion, or that the "gist" of the story contains some opinion about the nature of Nelle's conduct, the story remains founded on disputed facts: the conduct of Nelle and Gregory in regard to the price term in the contract. The First Amendment does not protect opinion if the underlying facts as stated in the story-that Nelle unlawfully altered the term without Gregory's knowledge and used it to seek damages-is determined to be false. See Bandstra , 913 N.W.2d at 47.
The Lauderback court further specified that its own finding of protected opinion was based on the "broad, unfocused, wholly subjective" reporting, as distinguished from allegations of specific conduct. 741 F.2d at 197. The impression of the broadcast in Lauderback was "that Lauderback was dealing unscrupulously with senior citizens." Id. But the WHO-TV broadcasts did not make broad assertions that Nelle was kind of sketchy, untethered from conduct. Instead, they focused on the specific interactions between Gregory and Nelle, and the specific acts of altering the contract and sending a demand letter with damages based on the allegedly unlawfully altered and unapproved contract. Opinion based on disclosed, truthful facts is rightfully well protected. Opinion based on incorrect facts is not.
3. Applicable Degree of Fault
Even if the statements were incorrect, Plaintiffs must still prove that it was made with the appropriate degree of fault to recover. Against media defendants, public-figure plaintiffs in Iowa must prove by clear and convincing evidence that a defamatory statement was made with "actual malice," that is, knowing it was false or with reckless disregard for its truth. Jones v. Palmer Commc'ns, Inc. , 440 N.W.2d 884, 895 (Iowa 1989), overruled on other grounds by Schlegel v. Ottumwa Courier , 585 N.W.2d 217, 224 (Iowa 1998). A private-figure plaintiff, in contrast, must prove a breach "of care which ordinarily prudent persons in the same profession usually exercise under similar conditions." Id. at 898. Whether a plaintiff is a public figure is a question of law. See id. at 894 ; In re IBP Confidential Bus. Documents Litig. , 797 F.2d 632, 644 (8th Cir. 1986).
*895 A plaintiff may be either a general public figure, or a limited public figure by dint of a specific public controversy a plaintiff is involved in. Gertz , 418 U.S. at 351, 94 S.Ct. 2997. A general public figure is one who "may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts." Id. "Absent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, an individual should not be deemed a public personality for all aspects of his life." Gertz , 418 U.S. at 352, 94 S.Ct. 2997.
Plaintiffs are not general public figures. There is no evidence of Roof One Exteriors' pervasive presence in the community in the way contemplated, and in fact the various members of the reporting team had never heard of Plaintiffs before the story came to their attention.[5] ECF No. 47-6, 57:22-58:6 (Brilbeck); ECF No. 47-7, 48:20-24 (Peterson); ECF No. 47-8, 17:3-7 (Dreesman); ECF No. 47-9, 12:2-14 (DaSilva). Gregory herself appears to have called Nelle due to their acquaintance at his veterinarian, where she works. ECF No. 47-1, 28:2-19.
A limited public figure, by contrast, is "one who 'voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues.' " Cockram v. Genesco, Inc. , 680 F.3d 1046, 1053 (8th Cir. 2012) (quoting Stepnes v. Ritschel , 663 F.3d 952, 963 (8th Cir. 2011) ). Defendants contend that Plaintiffs are limited public figures for the purposes of comment about their business practices and interactions with customers. Roof One Exteriors' advertising activities and status as a public-facing business, Defendants argue, should place Plaintiffs squarely in the public-figure realm.
First, as far as the record shows, prior to the airing of the WHO-TV broadcasts there was no public controversy about either Roof One Exteriors' practices in particular or the storm repair and roofing industries. As noted, no one at WHO-TV appears to have heard of Plaintiffs until Falke e-mailed Brilbeck in August 2015. Plaintiffs cannot therefore have injected themselves into a public controversy, let alone to the forefront to influence the outcome. And while news reporters may look for stories of public interest, the Gertz test is not one of public interest, but of public controversy . See Gertz , 418 U.S. at 346, 94 S.Ct. 2997. "A libel defendant must show more than mere newsworthiness to justify application of the demanding burden of New York Times ." Wolston v. Reader's Digest Ass'n , 443 U.S. 157, 167-68, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979). It is therefore not enough for Defendants to assert that the story is valuable or newsworthy, or that consumer-facing reporting has value beyond the specific consumer interaction, to convert Plaintiffs into limited public figures.
Nor did Plaintiffs, by advertising their services to the public, inject themselves into a public controversy of their own making. The status of a public-facing business has divided courts. See generally Sack on Defamation , § 5:3.5 n.317 (acknowledging division and citing cases). Although Defendants cite to instances in which other courts have held an entity to be a public figure when it engages in advertising and is then criticized on that basis, ECF No.
*896 50 at 37, Defendants cite no controlling authority from Iowa or the Eighth Circuit for that proposition.
Cases from both the Supreme Court and this Circuit, in fact, suggest that private parties must still place themselves into a public controversy and that an unexceptional amount of public activity is not enough. In Hutchinson v. Proxmire , 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979), a public researcher was called out for allegedly wasteful spending by a sitting United States Senator. The researcher received publicly announced grants and published public articles, but had a limited public profile "much like those of countless members of his profession" whose work "reach[ed] a relatively small category of professionals." Id. at 135, 99 S.Ct. 2675. Although the researcher had some public-facing activities, he was not a public figure because his writings did not become a matter of public controversy , not just interest, until the Senator's comments. Id.
Eighth Circuit precedent also supports a distinction between some public activity and becoming a public figure. See Porous Media Corp. v. Pall Corp. , 173 F.3d 1109, 1119-20 (8th Cir. 1999) ; Lundell Mfg. Co. v. Am. Broad. Cos. , 98 F.3d 351, 363-64 (8th Cir. 1996). In Porous Media , the defendant Pall Corporation sent allegedly defamatory notices about a competing product to the largest customers of the plaintiff Porous Media, and the information then spread throughout the product's market. 173 F.3d at 1114. The Eighth Circuit explained that a prior advertising campaign by the plaintiff did not elevate it to the status of a public figure for the purpose of criticism of its product. Id. at 1120. Similarly, in Lundell , the plaintiff made garbage disposal units that became part of a public controversy over a local garbage problem. 98 F.3d at 354-55. The court noted that a public controversy existed and the workings of the garbage disposals featured prominently in a news broadcast about the issue. Id. Nonetheless, the Eighth Circuit explained that the plaintiff did not thrust itself into the controversy by selling the disposal units, and was not a public figure for comment on the functionality of its units-even though the workings of its own machines were a key part of the public controversy. Id.
The lead case Defendants cite, Steaks Unlimited, Inc. v. Deaner , 623 F.2d 264 (3d Cir. 1980), is distinguishable on its facts in addition to being from another circuit. The plaintiff there "launched an intensive campaign" of advertising at a cost exceeding $16,000 (in 1980), and the local news station and the Bureau of Consumer Affairs received complaints about both the quality of the product and the misleading advertising. Id. at 273-74. When the allegedly defamatory broadcasts aired, there was already a public controversy about both the plaintiff's business practices and advertising campaign. See id. For Plaintiffs here, in contrast, there was no controversy about either point until Defendants ran back-to-back stories in September 2015 and reached out to the Iowa Attorney General and the Iowa Insurance Division. The dispute between Nelle and Gregory was essentially a private dispute until Defendants publicized it.
Nor could the Iowa Attorney General's investigation impact Plaintiffs' status as private figures, as Defendants contend. Defendants' broadcasts occurred on September 1 and 2, 2015, and May 2, 2016. The Iowa Attorney General did not issue a release about the AVC until August 17, 2016. ECF No. 47-16. All three broadcasts, in other words, occurred before any announcement from the Iowa Attorney General, and Plaintiffs' status for earlier stories could not have been affected by that later event. Neither are Plaintiffs public figures due to the apparent interest of the *897 Iowa Insurance Division and Iowa Attorney General in the September 2 broadcast, as that interest was sparked by Defendant's own actions in approaching those entities after the first broadcast aired. "Clearly, those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure." Proxmire , 443 U.S. at 135, 99 S.Ct. 2675 (citing Wolston , 443 U.S. at 167-68, 99 S.Ct. 2701 ).
Plaintiffs are therefore private figures, bringing a claim of defamation against media defendants. The appropriate degree of fault is professional negligence, or a breach of that "which ordinarily prudent persons in the same profession usually exercise under similar conditions." Jones , 440 N.W.2d at 898. There is ample evidence of a factual dispute over whether Defendants published their stories in breach of the standard of care for a news reporter. This includes dueling experts who reach opposite, but plausible, conclusions about Brilbeck's investigation leading up to the story. ECF No. 47-41; ECF No. 54-8.
"Custom in the trade is relevant but not controlling." Jones , 440 N.W.2d at 898. Beyond the experts, Plaintiffs have shown more than enough facts to support a claim of professional negligence. Other factors to be considered include: (1) whether the material was topical and required prompt publication, or whether sufficient time was available for a thorough investigation of its contents; (2) the newsworthiness and public interest in the material and its publication; (3) the damage to the plaintiff should the publication prove false; and (4) the reliability of the source. See id. "Ordinarily, issues of negligence are not susceptible of summary adjudication but should be resolved by trial in the ordinary manner." Id. at 899 (citing Schermer v. Muller , 380 N.W.2d 684, 687 (Iowa 1986) ).
Nothing about the story required it to air on September 1, 2015. Nonetheless, it aired on September 1, the same day that Brilbeck interviewed Gregory, Nelle, Falke, and Oberbillig.[6] Brilbeck did not follow up with Gregory or Falke about the contingency contract explanation Nelle provided or with the insurance company. Nor does the record contain any evidence that Defendants made any effort to check into the backgrounds of Gregory, Nelle, or Falke in order to determine whether they were reliable.
Further, Brilbeck refused to even look at or read the scope of insurance that Nelle offered, which was the source of the price term at the heart of the story.[7] ECF No. 54-2, 35:22-36:14. The scope of insurance, a sixteen-page insurance document, shows that Nelle did not submit the Contract to Gregory's insurance company. ECF No. 54-16. And the scope casts doubt on Gregory's story that she had no idea where the price term came from, as it is clearly addressed to Gregory and makes no mention of Nelle or Roof One. Id. In any event, Brilbeck refused to even look at it, so he could not have known beforehand what information it may have contained *898 relevant to the story, or whether it would explain the price term. Nor did Brilbeck look into what, exactly, a contingency contract is, what a proper, legal version would have looked like, or what the practices of other storm chasers or the insurance companies are.
Similarly, Defendants contend the broadcasts included information from outside experts that lent credibility to the broadcasts. But, taking the evidence in the light most favorable to the plaintiff, the outside experts appear to have received incomplete explanations about the underlying facts, somewhat blunting their independence and leading them to "pile on" the narrative of wrongdoing. See, e.g. , ECF No. 54-5, 3:22-4:2 (Oberbillig interview). So too to use Falke as the sole industry expert. Falke was the person who brought the story to WHO-TV in the first place, and who does not appear to know anything about contingency contracts, but was nonetheless the sole "independent" member of the roofing industry interviewed for the broadcasts. Defendants did not talk to anybody else in the "storm industry" to see if, as Nelle said, that was common practice. While none of these would rise to the level of actual malice, they are sufficient to show a dispute of fact as to professional negligence.
4. Injury
"To recover in an action for defamation, a plaintiff must ordinarily prove some sort of cognizable injury, such as injury to reputation." Nickerson , 542 N.W.2d at 513. While hurt feelings and personal suffering may be a basis for ultimate recovery as parasitic damages, they may not be the sole evidence of damages to justify an action for defamation. Schlegel , 585 N.W.2d at 221. Cognizable injury also naturally includes financial harm. See Sack on Defamation , § 10:5.1; Cantu v. Flanigan , 705 F.Supp.2d 220, 224 (E.D.N.Y. 2010). In Schlegel , the court addressed the issue of loss of business first, and only proceeded to harm to reputation after it found no evidence of loss of business-because those claims had been dismissed. 585 N.W.2d at 225 ("[T]here is no evidence that the false report caused ... a loss of business."). A plaintiff must show that financial or reputational harm was caused by the alleged defamation. Id.
Defendants are correct that many of Plaintiffs' personal anecdotes do not rise to the level of harm needed to move forward on a defamation claim. Further, Nelle's evidence of physical, mental, and emotional issues can only qualify as "parasitic" harm, and cannot independently sustain an action for defamation.
The record does, however, contain evidence, taken in the light most favorable to the Plaintiffs, that Nelle and Roof One Exteriors were harmed both financially and in reputation by Defendants. Defendants' own expert suggests there was at least some financial loss, even if not as much as Plaintiffs allege. ECF No. 47-40 ¶ 26. Nelle testified in his deposition that he knocked on doors after the stories aired, along with his salesman, and that both were rebuffed, sometimes by people referencing Defendants' September broadcasts. ECF No. 47-4, 38:11-40:25.
In support of reputational harm, Plaintiffs submit four affidavits. Two are from Mark Schmidt, who owns another Roof One-affiliated business, and Mattie Preston, a former customer of Nelle. ECF Nos. 54-13; 54-14. Both affidavits attest they had positive views about Nelle, viewed Defendants' broadcasts in September 2015, and as a result of those broadcasts and the suggestion within that Nelle engaged in fraud, had a more negative impression of Plaintiffs.[8] In addition, Plaintiffs submit an *899 affidavit from Harry Evans, general manager of Roof One Restoration in Missouri. ECF No. 54-12. Evans's affidavit states that he became aware of the news stories because customers and competitors of his in Missouri had brought them up, concerned that the story showed Nelle and Roof One Exteriors in Iowa defrauding customers. Id. As a result, Evans had to explain that the Roof One Exteriors business in Iowa was separate from his business.[9] Id. In essence, Evans suggests the reputation of Roof One Exteriors in Iowa suffered as a result of the broadcasts, as did Evans's own business. Finally, Plaintiffs submit an affidavit from Maureen Nelle, James Nelle's ex-wife. ECF No. 54-11. Her affidavit states that while she did not believe the WHO-TV broadcasts, she knew other people who did and who perceived Nelle more negatively as a result. Id. ¶¶ 6-9. Between the affidavits and the financial evidence, there is sufficient evidence of reputational harm to make a submissable case of defamation.
Defendants challenge the extent of Plaintiffs' harms, primarily through two arguments. First, that some harm has been done by the public announcement of the AVC; and second, that weather patterns would have sharply decreased Plaintiffs' business regardless. These are valid issues, and Defendants are free to present them at trial to mitigate damages. But neither shows that there is no genuine dispute that Roof One Exteriors was not harmed at all, as would be necessary in order for the Court to grant summary judgment on the basis of damages.
This Court is mindful of "turning libel per quod into 'libel per se lite,' " as the Bierman court cautioned. Bierman , 826 N.W.2d at 463. But neither will the Court turn away genuine evidence of harm when presented. In Bierman and Schlegel , the evidence the plaintiffs put on was of people whose opinions did not appear to have been affected by the alleged defamation. Id. ("[Plaintiff's work supervisor] did not assert that anyone at work thought less of [the plaintiff] because of the statements in the book."); Schlegel , 585 N.W.2d at 225 (explaining no witness testified that they thought ill of the plaintiff because of the false report). In contrast, Plaintiffs here have evidence of lost business opportunities and harm to reputation, from the affidavits of Evans, Maureen Nelle, Schmidt, and Preston. If Defendants' arguments on damages are correct, Plaintiffs "may face substantial obstacles in meeting [their] burden of proof" at trial, but that challenge does not mean Plaintiffs cannot present a submissable case to survive summary judgment. Cockram , 680 F.3d at 1055 (citation omitted).
When drawing all reasonable inferences for Plaintiffs, Plaintiffs have shown a dispute of material fact about the underlying truth of the publication, their status as private figures, a breach of a professional standard of care in publishing, and that publication resulted in actual injury. Accordingly, *900 the Court denies Defendants' motion for summary judgment as to Count II.
C. Defamation By Implication
Plaintiffs allege in Count Three of their Complaint that Defendants, through the WHO-TV broadcasts, position true facts together to imply the existence of other, false and defamatory facts. The analysis of defamation by implication largely tracks the elements of libel per quod, and the Court will rest on its above analysis to the extent they are similar.[10] However, a plaintiff must also demonstrate that a defendant has juxtaposed a series of facts so as to imply a defamatory connection between them, or created a defamatory implication by omitting facts even though the facts were correct. Stevens v. Iowa Newspapers, Inc. , 728 N.W.2d 823, 827 (Iowa 2007) (citing Dan B. Dobbs, Prosser & Keeton on the Law of Torts § 116, at 117 (Supp. 1988) ). Defamation by implication comes from what is not said in a statement.
Plaintiffs argue that, by showing the contract in the background of the news reports, Defendants implied the existence of undisclosed information about the contract that supported Defendants' story. But Plaintiffs have made no showing as to what the underlying defamatory implication would be, or how it would be beyond the statements already made, explicitly, in the broadcast. Showing the contract in the background does not support a claim of defamation by implication.
There is a genuine dispute of material fact, however, as to whether Defendants' broadcasts omitted facts about the price term. In particular, the September broadcasts leave out the source of the price term, which was Gregory's scope of insurance. Defendants knew, or should have known, that the price term came from the scope of insurance from Gregory's insurance and was not a number Nelle made up for the purpose of charging Gregory more. Nelle told them as much, pointed Brilbeck to the contingency language in the contract, and the scope of insurance makes that clear. ECF No. 54-2, 36:1-21. Gregory's deductible, and therefore her out-of-pocket costs, remained the same before and after the price term was written in. Instead, however, one could watch the September broadcasts and have no idea where the price terms Nelle placed on the contacts originated, and believe the defamatory implication-bolstered by the broadcasts' statements that Nelle submitted his contract to the insurance company-that the price term was made up to charge Gregory and her insurance company more. These are implications Defendants should have known were unwarranted. The Court therefore denies Defendants' Motion for Summary Judgment as to Count Three.
D. "Of and Concerning" Roof One Nebraska, LLC.
Defendants also move for summary judgment against Plaintiff Roof One Nebraska, LLC, arguing the WHO-TV broadcasts were not "of and concerning" the Nebraska entity. "[I]f the alleged libel contains matters of description or other references therein, or the extraneous facts and circumstances ... show that plaintiff was intended to be the object of the alleged libel, and was so understood by others," then the statement is "of and concerning" the plaintiff. Brummett v. Taylor , 569 F.3d 890, 892 (8th Cir. 2009) (quoting Ball v. Taylor , 416 F.3d 915, 917 (8th Cir. 2005) ). But "[i]t is necessary that the recipient of the defamatory communication understand it as intended to refer to the plaintiff." Restatement (Second) of Torts § 564, cmt. a (Am. Law Inst. 1977). In *901 other words, there must be some evidence that the statement was either intended to refer to the plaintiff or understood as referring to the plaintiff in that way.
In each WHO-TV broadcast, the first mention of Roof One Exteriors is as "Roof One Exteriors of Winterset." Gregory is identified as being from Winterset as well. Nebraska is never mentioned, nor is the fact that other Roof One-related entities do business anywhere other than Winterset, or that other Roof One-related entities exist. The reports were broadcast in Iowa, by an Iowa station, about an explicitly Iowa company and location. There is no evidence the reports were intended to, tried, or did refer to anyone other than Nelle and "Roof One Exteriors of Winterset," and no evidence that Roof One Nebraska, LLC was harmed. In addition, Roof One Nebraska, LLC was dissolved on June 2, 2015, months before the broadcast. It would not have been reasonable for anyone to view the broadcast as referring to a dissolved company that was not named in the broadcast and operated in another state, and the record contains no evidence that anyone in fact did. Because no evidence suggests that Roof One Nebraska, LLC was intended to be the object of the alleged defamation or was so understood by others, or could have suffered harm to its reputation while it did not exist, the Court grants summary judgment for Defendants as to Plaintiff Roof One Nebraska, LLC as to all claims.
E. Intentional Infliction of Emotional Distress
Plaintiffs claim, in Count Four, the intentional infliction of emotional distress. In order to prove intentional infliction of emotional distress, a plaintiff must show:
(1) outrageous conduct by the defendant; (2) the defendant intentionally caused, or recklessly disregarded the probability of causing, the emotional distress; (3) plaintiff suffered severe or extreme emotional distress; and (4) the defendant's outrageous conduct was the actual and proximate cause of the emotional distress.
Barreca v. Nickolas , 683 N.W.2d 111, 123 (Iowa 2004) (quoting Fuller v. Local Union No. 106 , 567 N.W.2d 419, 423 (Iowa 1997) ). In order to qualify as outrageous, conduct "must be 'so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " Fuller , 567 N.W.2d at 423 (quoting Harsha v. State Savs. Bank , 346 N.W.2d 791, 801 (Iowa 1984) ). Tortious or criminal intent, intent to inflict emotional distress, or even "a deliberate campaign to badger and harass" cannot support a finding of outrageous conduct under this tort. Suntken v. Den Ouden , 548 N.W.2d 164, 168 (Iowa Ct. App. 1996) (citing Vinson v. Linn-Mar Cmty. Sch. Dist. , 360 N.W.2d 108, 118 (Iowa 1984) ).
Defendants' actions here do not rise to the level of outrageous conduct, for many of the same reasons, described below in section III.F, that they do not rise to the level of constitutional actual malice. Even when viewed in the light most favorable to Plaintiffs, Defendants aired a story of wrongdoing, and in the light most favorable to Plaintiffs, may have gotten it wrong. But Defendants did not make the story up out of thin air or air it without any investigation. Brilbeck spoke to Nelle, Falke, two experts, and Gregory. Even if the story ultimately turned out to be incorrect, investigating and airing a story that alleges misconduct by another does not go beyond all possible bounds of decency. See, e.g. , Benishek v. Cody , 441 N.W.2d 399, 402 (Iowa Ct. App. 1989) (finding accusations of embezzlement not outrageous). And while there is direct evidence that *902 Brilbeck "believed Nelle belonged in jail," there is scant evidence that this belief led to any actions taken with an intent to inflict harm on Nelle, rather than report the story. Therefore, the Court grants summary judgment for Defendants and against Plaintiffs as to Count Four.
F. Punitive Damages
Punitive damages for defamation are only available on a showing of actual malice. Nickerson , 542 N.W.2d at 511 (citing Jones , 440 N.W.2d at 884 ). Actual malice demands a high bar, requiring clear and convincing evidence the defamatory statement was made with knowledge that it was false, or with reckless disregard for their truth or falsity. Jones , 440 N.W.2d at 894. Reckless disregard is satisfied by a showing of a "high degree of awareness of probable falsity." Id. (quoting Garrison v. Louisiana , 379 U.S. 64, 74, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964) ). The test is one of subjective awareness of probable falsity, not that of a reasonable person. See Gertz , 418 U.S. at 334 n.6, 94 S.Ct. 2997 ; St. Amant v. Thompson , 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968) ("There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication."). Although ill will may be relevant to the inquiry, it is insufficient for a finding of actual malice. See Harte-Hanks Commc'ns, Inc. v. Connaughton , 491 U.S. 657, 668, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989) ; see also Bertrand v. Mullin , 846 N.W.2d 884, 899 (Iowa 2014) ("Actual antagonism or contempt has been held insufficient to show malice." (alteration omitted) (quoting McCarney v. Des Moines Register & Tribune Co. , 239 N.W.2d 152, 156 (Iowa 1976) ) ). For actual malice, summary judgment requires a more searching inquiry into "whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not." Stevens , 728 N.W.2d at 830 (quoting Anderson , 477 U.S. at 255-56, 106 S.Ct. 2505 ).
Plaintiffs cannot meet the demanding burden of the actual malice standard. As the Court has noted, there is a genuine dispute of material fact as to the truth of the "gist" of the story. There is little evidence in the record to suggest, however, that Brilbeck or other members of the WHO-TV team subjectively knew, or harbored serious doubts, that the story was false. Brilbeck, Peterson, and DaSilva all stand by the story. ECF No. 47-1 ¶¶ 62-63, 71; ECF No. 47-9, 66:18-67:6. And while actual malice does not require a reporter to go on record with doubts, it is not satisfied by simple speculation that reporters doubt more than they let on. Various reporting failures that Plaintiffs complain of, including failure to investigate further, see Harte-Hanks , 491 U.S. at 688, 109 S.Ct. 2678, or not accepting a plaintiff's view of events, see Edwards v. Nat'l Audubon Soc'y, Inc. , 556 F.2d 113, 121 (2nd Cir. 1977), similarly do not rise to the level of actual malice.
At its core, the story as Brilbeck heard it was a he said/she said debate. Gregory stated she thought she signed an estimate and was not present when the price term was added to the contract. Nelle says that Gregory signed a contract for work and that she was sitting next to him when he added the price term. Nowhere in Brilbeck's interview with Nelle, or in the rest of Brilbeck's reporting, is evidence provided that would tip the scales decisively, such that taking one side over the other could only happen over serious doubts. That Brilbeck chose to believe Gregory over Nelle does not support a finding of actual malice.
The strongest evidence Plaintiffs point to is that Brilbeck refused to even look at *903 the scope of insurance when Nelle offered it. That is certainly avoidance of something. But even if Brilbeck had looked at the scope of insurance, the scope is not evidence that Gregory was present when Nelle filled in the price terms in their contract, or that Gregory knew she had actually signed a contract for work and was trying to back out. That is, by not looking at the scope, Brilbeck did not avoid viewing a document that would otherwise raise a high probability of falsehood. Nothing in the scope references Plaintiffs, and Nelle is as likely to have a copy of the scope of insurance for making an estimate as he is to do repair work. Nelle's own statement that he got the price term from Gregory's insurance company in fact made it into the original broadcast. ECF No. 47-12 ("Nelle told us he added the figures after he got them from the insurance company."). That this statement made it into the broadcast makes it difficult to see what examining the scope of insurance would have subjectively provided to Brilbeck in investigating the story.
Plaintiffs argue, and the record is clear, that Brilbeck thought Nelle had cheated and terrorized Gregory, was committing fraud, and belonged in jail. But Plaintiffs do not point to anything in the record that suggests this led Brilbeck to ignore doubts about the story. If anything, the opposite is true. Brilbeck had no prior relationship with, or information about, Plaintiffs. The only reason Brilbeck harbored negative feelings was because he believed the negative story he was told. Other members of the news team, none of whom appear to have harbored the same feelings as Brilbeck, also stand by the reports, which suggests that any animus did not in fact lead Brilbeck to ignore doubts. The same is true of Brilbeck's apparent unhappiness that DaSilva was asked to go back and talk to Nelle again. This may well be circumstantial evidence of actual malice, but only if it were paired with some reason beyond speculation to think Brilbeck was nervous because he had ignored doubts he had in airing the story. There is none here.
Plaintiffs also argue that evidence of actual malice can be found in the fact that Brilbeck did not air versions of the story more in sync with what Nelle told Brilbeck, and that WHO-TV did not air a follow-up story. So long as Defendants believed the broadcasts portrayed Nelle truthfully, however, there is no requirement that he be portrayed in a positive light, and Plaintiffs do not hold editorial rights over Defendants' broadcasts. See Janklow v. Newsweek, Inc. , 788 F.2d 1300, 1306 (8th Cir. 1986). So too with Defendants' decision not to air a story after DaSilva followed up with Nelle. While DaSilva had "a better understanding of [Nelle's] perspective," ECF No. 54-18, 28:6-16, DaSilva also apparently did not feel that the prior story had misstated any facts. ECF No. 47-9, 66:18-67:6. In the absence of any evidence disputing this assertion, it cannot support a claim of actual malice.
Actual malice is a demanding standard. It is easy, with the benefit of hindsight, to nitpick even decisions that seem obvious at the time. But it is not enough that a reporter was aggressive, negligent, or utterly incorrect. Therefore, the Court grants summary judgment for the Defendants, barring the submission of punitive damages.
IV. CONCLUSION
The First Amendment's protections of speech sweep broadly, in order to protect a national commitment to public debate that is "uninhibited, robust, and wide-open." New York Times Co. v. Sullivan , 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). But those protections tolerate false speech only insofar as they must to protect more valuable commentary. For *904 this reason and those already stated, Defendants' Motion for Summary Judgment (ECF No. 47) is GRANTED against Plaintiff Roof One Nebraska, LLC on all counts. With respect to Plaintiffs Nelle, Roof One Exteriors, and Roof One of Iowa, Defendants' Motion for Summary Judgment (ECF No. 47) is GRANTED as to Counts One and Four and DENIED as to Counts Two and Three.
IT IS SO ORDERED.

Defendants also argue that the allegedly libelous statements were not "of and concerning" Plaintiff Roof One Nebraska, LLC. This challenge, and the status of Roof One Nebraska as a party, is addressed below in section III.D.

References to the ongoing investigation of the Iowa Attorney General's office or to changes in Nelle's standing with the Better Business Bureau during the May 2, 2016 broadcast, were true and do not support a claim of defamation.

That Nelle may dress up as a Tiger and act out for the cameras at baseball games, apparently solely to entertain, does not turn him or his company into public figures, limited or otherwise. ECF No. 47-1 ¶ 119. The WHO-TV broadcasts had nothing to do with Nelle's antics at baseball games, and the record does not suggest that he has in the past, or might have in any way used that notoriety to the benefit of his business.

Brilbeck also testified at his deposition that he spoke to four or five other roofers about the story on September 1 before the story aired, although he did not remember their names or show them the contract. ECF No. 47-6, 27:7-29:8.

Although not necessarily the "gist" of the story, the September broadcasts suggest that Nelle was improperly acting as an insurance adjustor and submitting documents alone. The Iowa Insurance Division's investigation, in fact, is predicated on this fact. The scope of insurance and the May broadcast make clear that, whatever else he did, Nelle did not submit a copy of his own contract with Gregory, with altered price terms, to the insurance company. He could not, because the altered price term came from the insurance company itself.

Defendants argue that this Court should follow Clay v. Lafarge North America , 985 F.Supp.2d 1009 (S.D. Iowa 2013), and disregard these affidavits. In Clay , however, the Court rejected an affidavit by a plaintiff that contradicted prior testimony and, in essence, alleged additional claims and wrongdoing. Id. In contrast, Plaintiffs here have been alleging defamation and harm to their reputation since the beginning of this litigation. The existence of an affidavit that says just that does not bring new or unexpected dimensions. Nor does the late disclosure of these affidavits appear to have prejudiced Defendants; the simple affidavits attest to viewing the broadcasts and coming away with a more negative reputation of Plaintiffs. Whether they are credible witnesses on those grounds is not a decision to be made on summary judgment.

Evans also suggests his relationship with Nelle became strained after the broadcast, although the affidavit does not suggest that Evans believed the stories or had a lower opinion of Nelle because of them.

The parties' respective briefing treats them as essentially the same.